The GREAT WESTERN SUGAR COMPANY, a Delaware corporation, Plaintiff-Appellee and Cross-Appellant,

v.

NORTHERN NATURAL GAS CO., a Delaware corporation, Defendant,

Kansas-Nebraska Natural Gas Co., Inc., a Kansas corporation, Defendant-Appellant and Cross-Appellee.

Nos. 80CA0081, 80CA0236.

Colorado Court of Appeals, Div. I.

June 17, 1982.

Rehearing Denied July 15, 1982.

Certiorari Granted March 21, 1983.

Holmes & Starr, Hardin Holmes, Kenneth L. Starr, Jeffrey Reiman, George E. Clough, Denver, for plaintiff-appellee and cross-appellant.

Baker & Hostetler, Bruce D. Pringle, James A. Clark, Denver, Hershberger, Patterson, Jones & Roth, Richard Jones, William R. Smith, Wichita, Kan., for defendant-appellant and cross-appellee.

TURSI, Judge.

In this action for breach of contract and fraud, Great Western Sugar Company (GW) sought damages from Kansas-Nebraska Natural Gas Company (KN) and Peoples Division of Northern Natural Gas Company (Northern) in connection with interruptions in natural gas service occurring between November 1973 and March 1979 to GW's sugar beet processing plants in Ovid and Sterling, Colorado, in Scottsbluff, Nebraska, and in Goodland, Kansas. Jury verdicts totalling $1,000,000 were returned for GW against KN. Judgment was entered in the amount of the jury verdicts plus $350,229 in prejudgment interest. Northern was found not liable and that judgment has not been appealed. KN appeals the judgment

against it, and GW cross-appeals as to the amount of damages awarded against KN. We affirm in part and reverse in part.

KN is a natural gas pipeline company operating an interstate pipeline system which serves Wyoming, Colorado, Nebraska, and Kansas. It is a jurisdictional pipeline subject to regulation by the Federal Energy Regulatory Commission (FERC), formerly the Federal Power Commission (FPC). *See Public Service Co. v. Public Utilities Commission,* Colo., 644 P.2d 933 (1982) (footnote 1). It is also subject to the jurisdiction of the Colorado Public Utilities Commission and the Kansas Corporation Commission.

GW operates thirteen factories which process sugar beets into sugar. For its factories at Ovid and Sterling, Colorado, and Scottsbluff, Nebraska, GW purchases natural gas directly from KN. For its factory in Goodland, Kansas, GW purchases gas from Northern which is supplied by KN pursuant to a service agreement. Natural gas is used by GW during its "campaigns" for space heating, beet pulp dryers, and boilers. The campaigns (the beet processing period from approximately November to January) coincide with KN's periods of peak demand for natural gas. Except for its space heating requirements which are furnished on a firm basis, GW purchases natural gas on an interruptible basis. For such interruptible service, GW pays a lower rate and maintains an alternate fuel capacity for periods when its gas service is interrupted to meet the demands of domestic and commercial users and other users having a higher priority of service. For interruptions which GW experienced between November 1, 1973, and March 1, 1979, it sought approximately $3.7 million. This represented the difference in price between natural gas under the contracts and the price of fuel oil which had to be used as a substitute fuel during periods of interruption.

GW's and KN's contracts for natural gas service date back to 1955 and were renewed periodically. The provision of the contracts dealing with interruption for the period in question is as follows:

"It is specifically agreed as a condition precedent to provision of the rate herein and to the making of this agreement by KN that notwithstanding any other provision of this agreement delivery of gas to [GW] shall be subject to interruption and that KN, irrespective of the happening of any of the occurrences herein before mentioned or referred to, but in its absolute discretion and without liability to [GW] for damages or otherwise, shall have the right to and at any time with or without notice may interrupt in whole or in part delivery of gas to [GW] hereunder as and whenever from time to time KN is required to do so in order to meet the demands of domestic and commercial users or other users having a higher priority of service.

[GW] further represents and agrees that it will maintain standby fuel installations wherever necessary to avoid irreparable or serious loss or damage to person or property in event of interruption of gas supply."

Similarly, the service agreement between Northern and KN provided for interruptible service.

From 1955 until November 7, 1973, KN determined whether to interrupt GW by comparing its anticipated demand over the next 24 to 36 hours with its available supply of gas. If that projection indicated that there was sufficient natural gas available to meet the anticipated needs of KN's firm and interruptible customers, it would deliver gas to all customers. Otherwise, KN would begin stopping delivery to its interruptible customers. This is referred to as the "historical 24 to 36 hour analysis."

On November 7, 1973, KN stopped using the historical 24 to 36 hour analysis and adopted a new policy concerning the delivery of gas to interruptible customers. Under that policy, KN automatically discontinued deliveries of gas to all interruptible customers whenever it was withdrawing gas from its storage reservoirs. The new policy is referred to as the "storage withdrawal interruption policy."

GW contends that under the contracts KN was entitled to interrupt gas service to the sugar factories only when it lacked either the supply of gas or pipeline capacity to deliver gas to the factories, after first meeting the short term needs of residential and commercial customers, and that KN could only consider the availability of gas supply and pipeline capacity to serve those higher priority needs based on the historical 24 to 36 hour analysis. KN contends that the contracts did not limit its interruption decisions to the short term needs of residential and commercial users, and that orders of the FPC required it to husband gas in storage, if necessary, to meet future high priority demands.

Beginning in the late 1960's there was a national gas shortage. KN's gas reserves were being consumed at a rate faster than they were being replaced by new discoveries. In addition to declining gas reserves, gas pressure declined throughout KN's system because of the depletion of old wells and the reduction in pressure rate of flow, or deliverability. KN had begun utilizing underground storage reservoirs in 1964 to store gas at points on the system nearer the markets, where it could be utilized to maintain pressures in the pipeline. It became increasingly necessary to supplement deliverability from producing fields with deliverability from storage to maintain necessary pipeline pressure.

In response to the national gas shortage, the FPC promulgated various orders and statements of policy. Order No. 431, issued April 15, 1971, (18 C.F.R. § 2.70 (1981)) was a statement of general policy concerning supplies and capacity for the 1971–72 heating season. It encouraged pipeline companies subject to the FPC's jurisdiction to fill their storage fields to meet anticipated demands. It also required the pipelines to submit written reports to the FPC stating how they would implement the FPC policy of protecting dwindling gas supplies and ensuring service for 1971–72. Any pipeline with a shortage was required to file new tariff sheets setting forth curtailment plans to effectuate the FPC policy. *See Atlanta Gas Light Co. v. FPC,* 476 F.2d 142 (5th Cir.1973).

Order No. 467–B, issued March 1, 1973, (18 C.F.R. § 2.78 (1981)) was another statement of general policy which prescribed "priority-of-service categories for use during periods of curtailed deliveries. . . ." Interruptible industrial requirements, such as GW's, were placed in the lowest categories. In that order, the Commission noted that it was acting because:

"In situations where the need to curtail arises suddenly and without anticipation, and where no curtailment plan has been approved . . . the pipeline is placed in the difficult position of undertaking service cutbacks at the risk of civil liability to direct and indirect customers if the curtailments are not required by Commission order. . . . *See International Paper Co. v. FPC,* [476 F.2d 121 (5th Cir.1973)]."

Order No. 498, issued December 21, 1973, requested, *inter alia,* "all natural gas pipeline companies, where possible, [to] husband present supplies of natural gas for high priority usage" and required the filing of reports with the FPC on conservation measures that had been undertaken.

On August 29, 1975, KN filed tariff sheets with the FPC which contained the following limitation on service to industrial customers.

"Seller shall not be required to remove gas from gas storage reservoirs for delivery to consumers served by Seller on an interruptible basis or under interruptible service rate schedules in this Tariff."

The tariff also limited the total volume required to be delivered to users in any calendar year.

A copy of these tariff provisions was mailed to GW on August 29, 1975.

These tariff provisions were suspended by the FPC for a statutory period of five months and were then permitted to become effective as of March 14, 1976, subject to refund pending final Commission approval. In December 1976, additional tariff sheets were filed establishing priorities of service, but retaining the aforementioned limitations. The lawfulness of these tariff provi-

sions was the subject of a proceeding before the FERC designated as Docket No. RP76-90.

On June 25, 1976, GW filed its protest and intervened in RP76–90, claiming that the reductions in its gas service were unlawful because the tariff provisions constituted an abandonment under the Natural Gas Act 15 U.S.C. 717, et seq., (1976). GW specifically complained to the FPC about KN's practice of not serving it when withdrawing gas from storage. The FPC issued an order on June 30, 1977, holding that the tariff provisions should be considered a curtailment plan under Section 4 of the Natural Gas Act, and not an abandonment under Section 7. Under Section 4, the tariff provisions are permitted to become effective, subject to a later determination of their lawfulness.

While this appeal was pending, proceedings in RP76–90 were terminated pursuant to a stipulated settlement. In accepting the settlement, the FERC did not rule on the justness or reasonableness of the tariff sheets filed by KN, and accepted the tariffs as a suitable curtailment plan.

GW sued KN and Northern in January 1978 for breach of contract and fraud. Defendants asserted that the FERC had primary jurisdiction to hear GW's claims and moved to refer the matters in dispute to the FERC for preliminary agency review. This motion was denied, as were subsequent motions to reconsider the issue.

GW moved for partial summary judgment against KN, asserting that KN's unilateral change in its delivery policy, which took effect on November 7, 1973, constituted a breach of KN's contracts with GW which provided service to GW's Ovid, Sterling, and Scottsbluff factories. KN also moved for summary judgment, asserting that certain FPC tariffs, certificates of public convenience and necessity, and orders immunized KN from contract liability. The trial court granted GW's motion, denied KN's motion, and ruled, as a matter of law, that the plain language of the applicable contracts did not allow KN to unilaterally withdraw any source of supply from GW's

use. The trial court also determined, as a separate basis for declaring KN in breach of contract, that KN was obligated to employ the same method it had used for 18 years before November 1973 in determining when to interrupt.

GW filed a second motion for partial summary judgment, contending that it was a third-party beneficiary of the service agreement under which KN supplied gas to Northern for ultimate distribution to, among others, GW's Goodland, Kansas, factory and that KN's November 7, 1973 policy change constituted a breach of the service agreement. The trial court ruled that KN breached the service agreement by interrupting service pursuant to the November 7, 1973 policy change. The court also ruled that GW could, as a matter of law, be a third-party beneficiary of that agreement, subject to an ultimate jury determination of whether KN and Northern intended to confer benefits upon GW under the agreement.

During trial, the court directed a verdict for Northern on the fraud claim and submitted all remaining issues to the jury. On July 12, 1979, on the breach of contract claim against KN, the jury awarded GW $775,000 for damages sustained at GW's Ovid, Sterling, and Scottsbluff factories. The jury specifically found that KN and Northern intended to confer benefits upon GW under the service agreement and on that contract claim against KN awarded GW $225,000 for damages sustained at the Goodland factory. The jury found for KN on the fraud claim and for Northern on the contract claim. The trial court then awarded prejudgment interest and costs to GW. KN's and GW's post-trial motions were denied and these appeals ensued.

KN argues on appeal that the trial court erred because of: (1) its failure to refer the matter to the FERC under the doctrine of primary jurisdiction, (2) its granting of partial summary judgment on the contract liability issue, (3) its exclusion of certain evidence, (4) its awarding prejudgment interest, and (5) its awarding expert witness fees to GW. GW claims that the court erred in denying its motion for a directed verdict.

## I. PRIMARY JURISDICTION

We disagree with KN's contention that the trial court erred in declining to refer issues to the FERC under the doctrine of primary jurisdiction. KN has previously sought and been refused referral by the Colorado Supreme Court, U.S. District Court of Nebraska, and this court.

The doctrine of primary jurisdiction:

"is a discretionary tool of the courts, a flexible concept to integrate the regulatory functions of agencies into the judicial decision making process by having agencies pass in the first instance on technical questions of fact uniquely within the agency's expertise and experience, or in cases whose referral is necessary to secure uniformity and consistency in the regulation of business, such as issues requiring the exercise of administrative discretion." *Columbia Gas Transmission Corp. v. Allied Chemical Corp.*, 652 F.2d 503 (5th Cir.1981).

*See Nader v. Allegheny Airlines*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Far East Conference v. U.S.*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412 (5th Cir.1976). No fixed formula exists for deciding when to invoke the doctrine, *U.S. v. Western Pacific R.R. Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), but courts should utilize it reluctantly where the application of the doctrine is inappropriate because of the nature of the action. *Mississippi Power & Light, supra.* Referral of issues to an agency is not required when the issue is strictly a legal one and the issues involved are within the conventional competence of the courts. *Nader, supra.*

The issues presented here involve common law contract claims. The fact that the Natural Gas Act and applicable tariffs affect some of the dealings between the parties does not oust state courts of jurisdiction over these common law claims. *Pan American Petroleum Corp. v. Superior Court*, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961); *Pan American Petroleum Corp. v. Kansas-Nebraska Natural Gas Co.*, 297 F.2d 561 (8th Cir.1962). State courts are competent to interpret tariffs as a question of law, *W.P. Brown & Sons Lumber Co. v. Louisville & Nashville R.R. Co.*, 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301 (1937), and the right to ultimate review by the U.S. Supreme Court facilitates uniformity of construction of tariffs. *Pan American v. Superior Court, supra.* Thus, preliminary resort to the FERC is not required merely because the applicability of a tariff is in dispute.

Although referral to an agency is particularly appropriate when the issues are subjects of pending proceedings, *Mississippi Power & Light, supra*, this is no longer the case here, since proceedings in RP76–90 have been terminated.

Our balancing of the benefits of seeking prior agency assistance and the need to resolve this dispute fairly, but expeditiously, *Columbia Gas Transmission, supra*, leads us to the conclusion that the trial court did not err in refusing to refer issues to the FERC. Common law contract claims are the basis of this litigation, and these claims are within the conventional competence of state courts.

## II. SUMMARY JUDGMENT

The trial court determined the principal liability issues by summary judgment. It ruled that KN breached its contracts with GW by improperly interrupting gas service to the Ovid, Sterling, and Scottsbluff factories, leaving only the issue of damages for the jury. The court also ruled that KN breached its contract with Northern and that GW could be a third-party beneficiary with regard to gas service to its Goodland factory, subject only to a factual determination by the jury as to whether the parties intended to benefit GW.

### A. Breach of Contracts Between GW and KN

The trial court relied upon two grounds in ruling that KN breached its contracts with GW. The first ground was based upon the undisputed fact that GW, as

an interruptible customer, did not receive any gas from KN storage facilities under the storage withdrawal interruption policy. We find this ruling consistent with *Kansas-Nebraska Natural Gas Co. v. Consumers Public Power District,* 179 Neb. 687, 140 N.W.2d 10 (1966) which held that, absent contract provisions to the contrary, all sources of supply must be made available to all customers of a gas supplier. We agree with this ruling.

The second ground for the granting of summary judgment was that the parties' course of dealing and course of performance included the historical 24 to 36 hour analysis for interruptions, and that the implementation of the storage withdrawal interruption policy breached the terms of the contract as established by the parties' course of conduct.

KN first argues that the trial court erred in examining the parties' historical behavior because the contracts at issue were not ambiguous and extrinsic evidence should not have been admitted. We disagree.

▮ Evidence of course of dealing and course of performance is admissible if it does not directly contradict the terms of a written agreement, but merely explains or supplements it. *Budget Systems, Inc. v. Seifert Pontiac, Inc.,* 40 Colo.App. 406, 579 P.2d 87 (1978). It is the policy of the Uniform Commercial Code to consider previous course of dealing in determining the meaning of contract provisions. *Amerine National Corp. v. Denver Feed Co.,* 493 F.2d 1275 (10th Cir.1974); §§ 4–1–201(3), 4–1–205, 4–2–208, C.R.S.1973. And, "a course of performance is always relevant to determine the meaning of the agreement" because "[t]he parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." Section 4–2–208, C.R. S.1973 (official comments 1 and 2).

The evidence relating to the parties' historical conduct under the contract explained how they interpreted the interruptible service provisions of their contracts. This evidence did not contradict any of the express terms of the contracts and was admissible in determining whether the contracts were breached. *Budget Systems, Inc., supra.*

KN argues that if course of dealing is to be considered, then the court should only have considered the parties' course of performance after November 7, 1973—the date on which the storage withdrawal interruption policy was implemented. We disagree. The long history of the parties' conduct under the contracts is relevant, and the court properly considered it. *See Amerine National Corp., supra.* The parties had been dealing with each other since 1955. Although several contract revisions had been made over the years, these changes did not alter KN's use of the historical 24 to 36 hour analysis, which the trial court properly determined to be the contract standard.

KN next contends that the trial court erred in construing the contracts without giving effect to FPC Orders Nos. 431, 467–B, and 498. We agree that these orders were incorporated by reference into the contract, but find that their exclusion was not prejudicial to KN because none of the orders authorized KN's change in policy.

▮ The interpretation of a written document is a question of law, and this court is not bound by the trial court's interpretation. *Budget Systems Inc., supra.* The following provision was contained in the contracts at issue:

"This agreement ... [is] subject to all valid and applicable laws and orders, rules and regulations of duly constituted authorities having jurisdiction or control over the parties, KN's facilities and gas supply, or any transaction contemplated hereby."

KN is a jurisdictional pipeline, subject to the orders of the FPC. *Mississippi Power and Light, supra.* Thus, we hold that the orders were incorporated in the contracts.

We have examined the orders, as summarized above, and do not find that they required a unilateral change in policy on the part of KN. The orders contain statements of general policy, requests to pipelines, and requirements for filing of plans and reports

to the Commission. They do not excuse KN's breach of contract.

### B. Breach of Service Agreement Between KN and Northern and GW's Third-Party Status

In 1966, GW constructed a new factory near Goodland, Kansas, and negotiated with KN for the purchase of gas for that factory. KN was not authorized to deliver gas in that area, but it told GW that it could do so indirectly through a service agreement with Northern. GW then entered into a contract with Northern for interruptible gas service, but it was KN which determined when service to interruptible customers should be shut off. GW's Goodland factory was treated in the same manner by KN as were the other three factories which were supplied gas directly by KN.

The trial court determined that GW was a direct, not an incidental beneficiary of the service agreement, and that KN's obligation was to deliver gas to Northern, except when it lacked an adequate gas supply to do so. It also ruled that KN could not unilaterally withdraw sources of supply from interruptible customers such as GW. However, the court ruled that a factual question remained as to whether KN and Northern intended to confer benefits upon a class of customers which included GW or GW itself. The jury found that KN and Northern had intended to confer benefits on GW.

KN argues that the trial court erred in granting summary judgment because the contract expressly states that KN was not required to furnish any volumes of gas in excess of firm demand. KN relies on that portion of the service agreement which states:

> "in no case is Seller to be required to furnish on any day a volume larger than the then existing Billing Demand plus (during the winter service period) the Winter Period Demand [total firm demand]."

This provision, read alone, appears to grant KN total discretion in supplying gas for interruptible customers. However, another provision in the agreement states:

> "Seller also agrees to make deliveries of gas to Buyer in daily volumes in excess of [firm demand] on an interruptible basis when gas and facilities are available for making such deliveries."

Based on this second provision, the trial court correctly construed the service agreement, in light of the parties' course of performance, to mean that KN could not cut off gas supplies for interruptible customers, unless it lacked an adequate gas supply.

KN next contends that the court erred in determining GW could be a third-party beneficiary under the service agreement. It argues that, under the laws of Kansas, which it contends should be applied, GW could not have been a third-party beneficiary. We disagree.

We do not reach the conflicts of law issue, because under the laws of both Kansas and Colorado, the trial court properly determined that GW could be a third-party beneficiary of the service agreement.

In Colorado, "a person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit such person, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract." *Fourth & Main Co. v. Joslin Dry Goods Co.,* Colo.App., 648 P.2d 178 (1982). The same proposition is true under Kansas law. *Martin v. Edwards,* 219 Kan. 466, 548 P.2d 779 (1976).

Kansas and Colorado law differ on how intent to benefit may be shown. In Kansas, the intent to benefit must be "clearly expressed in the contract" unless the contract is found to be ambiguous. Only if the contract is ambiguous can facts and circumstances surrounding its execution be used as aids in clarifying the parties' intent. *Martin, supra.* However, "the name of the person to be benefited by the contract need not be given, if he is sufficiently described or designated. Indeed, he may be one of a class of persons, if the class is sufficiently described or designated." *Burton v. Larkin,* 36 Kan. 246, 13 P. 398 (1887), cited with approval in, *Martin, supra.*

Colorado law states that although "intent to benefit the non-party need not be expressly recited by the contract, the intent must be apparent from terms of the agreement as well as surrounding circumstances." *Fourth & Main, supra.*

The service agreement states:

"WHEREAS, Seller is the owner of a system of pipelines and is engaged in the production, purchase, transportation and sale of natural gas; and

"WHEREAS, Buyer owns and operates distribution systems for the distribution and sale of natural gas in the Cities of Goodland and Kanorado, Kansas and for such operations desires a dependable supply of natural gas."

From the express terms of the service agreement, it is obvious that the parties entered into the agreement to benefit Northern's customers in Goodland, Kansas, by providing a dependable supply of natural gas. GW, as a customer in Goodland, was one of the class of persons who were intended beneficiaries of the service agreement. *Burton, supra; Fourth & Main, supra.*

■ The last error which KN assigns on the issue of the grant of summary judgment is that an issue of material fact existed as to whether KN notified GW of its policy to husband storage gas for high priority users. GW admits that there was an issue of fact as to notification, but contends that while the issue was relevant to their claim of fraudulent non-disclosure, it was immaterial to the breach of contract claim. We agree with GW. KN was required to provide gas to GW from all of its sources of supply, *Kansas-Nebraska v. Consumers, supra,* and its notification to GW that it no longer intended to do so could not alter its contractual obligations. Thus, the trial court correctly concluded that there were no issues of material fact concerning KN's contract liability and properly entered summary judgment.

### III. EXCLUSION OF EVIDENCE AT TRIAL

#### A. *KN's Tariffs*

KN contends that the trial court erroneously excluded from evidence as irrelevant, their tariffs filed with the FPC. The tariff provisions at issue provided that (1):

"Seller shall not be required to remove gas from gas storage reservoirs for delivery to consumers served by Seller on an interruptible basis . . .;"

2) customers receiving gas were subject to volume limitations not to exceed the volumes used in 1975 plus 50,000 MCF (thousand cubic feet); and 3) interruptible customers would be curtailed on the basis of priority categories. KN argues that these tariff provisions were incorporated by reference into the contracts pursuant to the previously quoted contract provision concerning incorporation of orders and regulations. Tariff provisions 1 and 2 outlined above were effective March 14, 1976, subject to possible refunds in the event the tariff was found unlawful by the FERC. 15 U.S.C. 717c(e) (1976). Provision 3 was effective July 1, 1977.

KN argues that the court's exclusion of the tariff resulted in its determination, as a matter of law, that KN breached its contracts when gas was being withdrawn from storage, when the tariffs, as part of the contract rights specifically permitted KN to interrupt for that purpose.

Our interpretation of the tariffs is that the provision at issue permitted KN discretion to enter into contracts limiting the sources of supply. However, the contracts, based upon the parties' prior actions, did not permit such a refusal to supply gas from storage or interruption of service unless KN lacked a sufficient supply of gas.

■ KN also contends that the exclusion of the tariff was error because it was precluded from introducing evidence of the maximum volume of gas to which GW was entitled under the contract. We disagree. This tariff provision was filed unilaterally by KN and, accordingly, cannot relieve it of contract liability. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

■ KN asserts that the exclusion of the tariff prevented it from showing that

under the 1977 tariff provision, GW's dryers were supplied with gas withdrawn from storage after July 1977. Again, we disagree. The tariff would demonstrate why GW claimed less damages for the period but would not insulate KN from liability from all interruptions to the dryers after July 1977. KN's burden was to demonstrate that it did not have an adequate supply of gas on days when interruptions occurred. Its burden was not to show that it properly served the dryers during certain periods. *See* discussion of cross-appeal, *infra.* Thus, the trial court properly ruled that the tariff was irrelevant on the issue of damages.

### B. KN's Expert Witness

The trial court excluded much of the testimony of KN's expert for various reasons. Some of the analyses were stricken because the court ruled that KN had breached its discovery obligations by not fully answering interrogatories propounded by GW concerning the expert witness and had failed to timely provide GW with the expert's work papers. Other analyses were stricken because they were based on facts contrary to the evidence, and because the analyses were not based on the established contract standard which required use of the historical 24 to 36 hour forecast for determining interruptions.

Unless clearly erroneous, a trial court's ruling on the admissibility of expert testimony is conclusive. *Freeman v. Gentry Builders, Ltd.,* 185 Colo. 123, 522 P.2d 739 (1974). The trial court has broad discretion to determine the sanctions to be imposed on a party for failure to disclose the substance of testimony intended to be elicited from a witness. C.R.C.P. 16(d)(3). *Wood v. Rowland,* 41 Colo.App. 498, 592 P.2d 1332 (1978). *See* C.R.C.P. 26(b)(4)(A)(i). This is especially true in view of the continuing duty to disclose and supplement in a reasonable manner the substance of an expert witness' testimony. C.R.C.P. 26(e)(1). *See Dolan v. Mitchell,* 179 Colo. 359, 502 P.2d 72 (1972). Furthermore, expert testimony may not be based on facts which are contrary to the evidence. *Liber v. Flor,* 160 Colo. 7, 415 P.2d 332 (1966).

With these principles in mind, we have reviewed the trial court's evidentiary rulings and do not find that the court abused its discretion, or that the rulings are clearly erroneous. Therefore, we find no error in the exclusion of parts of the expert's testimony.

Also, KN's reliance on *Crist v. Goody,* 31 Colo.App. 496, 507 P.2d 478 (1972) is misplaced. There, this court held that a trial court has discretion to exclude evidence which was not properly identified before trial, but if the evidence is admitted, then the granting of a motion for mistrial or continuance is obligatory. Here, the trial court properly excluded the evidence.

## IV. PREJUDGMENT INTEREST

In view of our ruling on the cross-appeal in VI, *infra,* reversing the judgments insofar as they pertain to the money damages awarded and remanding the case for a new trial on the issue of damages, the award of prejudgment interest is also vacated. However, since the questions raised will come up again following the new trial, we will address them now.

The court found that KN had wrongfully withheld property, and therefore, GW was entitled to interest under § 5–12–102(1)(a), C.R.S.1973 (1981 Cum.Supp.). It further found:

"That the gain or benefit to the Defendant, Kansas-Nebraska, by virtue of such withholding of property from the Plaintiff was at least the interest rate to pay for borrowed money during the period of time in question which was ten percent.

"That the damage award of the jury must be prorated over the period that Plaintiff claims arose, being approximately six years, with interest compounded annually to the date of the judgment."

Accordingly, the court found that GW incurred damages of $166,666 in each of the first two years of damages and $166,667 in each of the four succeeding years, and awarded prejudgment interest in the amount of $350,229.

■ Contrary to KN's contention, we agree with the trial court's conclusion that § 5–12–102(1)(a), C.R.S.1973 (1981 Cum. Supp.) which became effective July 1, 1979, applies to any judgments in this case entered after that date. *Jasken v. Sheehy Construction Co.,* Colo.App., 642 P.2d 58 (1982). *Jasken* is dispositive of KN's contention that the amended statute is inapplicable because the withholding of the property was prior to the effective date of the amendment.

■ Pursuant to § 5–12–102(1), GW was entitled, at its election, to prejudgment interest at the rate of 8 percent per annum compounded quarterly, or "an amount which fully recognizes the gain or benefit realized" by KN.

The trial court awarded prejudgment interest at the rate of 10 percent. Its findings are inadequate for us to determine the basis upon which it determined the "gain or benefit realized" by KN in withholding the gas. Without these findings the award of interest at the rate of 10 percent was in error.

Furthermore, there was no factual basis for the courts proration of the jury award equally over the six year period in question. The statute provides that interest should run from the "date of wrongful withholding." The trial court's award made no findings in this regard and was therefore in error. On remand, the trial court should make the determinations outlined above prior to awarding prejudgment interest.

## V. EXPERT WITNESS FEES

■ The last error that KN assigns is the trial court's award of $44,382.21 to GW's expert who did not testify at trial because of the exclusion of KN's expert's testimony. There is no error in the trial court's decision that GW was entitled to an award of costs for its expert, even though he did not testify. *Leadville Water Co. v. Parkville Water District,* 164 Colo. 362, 436 P.2d 659 (1967); § 13–33–103(4), C.R.S. 1973; 10 *C. Wright & A. Miller, Federal Practice & Procedure* § 2678 at 230 (1973).

■ However, the trial court's order made no findings as to the reasonableness of the fee that GW's expert charged. Thus, we are unable to determine whether the court abused its discretion in the determination of the amount awarded to GW. On remand, the court should, after a hearing if necessary, make factual findings as to the reasonableness of the fee, and modify the award if appropriate.

## VI. CROSS–APPEAL

As a method of proving its total damages, GW introduced evidence consisting of calculations which showed its increased costs for each of the approximately 250 days in which interruptions occurred. In its defense, KN presented what it admits was only "evidence of a general nature and not on a day-by-day basis." This pertained to its declining reserves and deliverability during the approximately six year period, its problems in trying to serve its firm and interruptible customers on peak days during the winter, and the severity of the 1978–79 winter.

At the conclusion of KN's case and again after all the parties had rested, GW moved the court to instruct the jury, in the nature of a directed verdict, that it was to award to GW damages on the contract claims for each and every day of interruption of service after KN put its storage withdrawal interruption policy into effect. The motion was grounded on KN's failure to present any evidence demonstrating its physical inability to deliver gas to GW on any of the days when interruptions occurred. The court denied the motion.

GW also tendered a jury instruction to the same effect, which the court refused. Instead, the court instructed the jury that KN had the evidentiary burden of showing "that its nonperformance was excused on any given day due to its physical inability to deliver gas to Great Western." The verdict forms submitted to the jury, without objection, provided a space only for the award of a total amount of damages, without itemization on a day by day or year by year basis. Following the jury verdict, for

the reasons advanced in its motion for directed verdict, GW sought and was denied a judgment notwithstanding the verdict.

On cross-appeal, GW contends that the trial court erred in denying its motion for a directed verdict instructing the jury to award damages for each day that KN breached its contract and interrupted GW's gas service, without any reference to excuse for nonperformance. We agree.

A party who seeks to invoke an affirmative defense of excuse has the burden of proving its applicability. *Machebeuf v. Clements,* 2 Colo. 36 (1873), *aff'd,* 92 U.S. 418, 23 L.Ed. 504 (1876); *New Britain Machine Co. v. Yeo,* 358 F.2d 397 (6th Cir. 1966); *Detroit Edison Co. v. Main Island Creek Coal Co.,* 295 F. 781 (4th Cir.1924). *See Comfort Homes, Inc. v. Peterson,* 37 Colo.App. 516, 549 P.2d 1087 (1976).

Here, KN had knowledge uniquely within its possession as to the conditions which existed in its system for each day in which an interruption occurred. With this unique knowledge, as testified to by KN's chief dispatcher of gas, KN could have determined with precision which, if any, interruptions would have occurred, even under the historical 24 to 36 hour analysis. But, as found by the trial court and admitted by KN, KN failed to present any evidence to demonstrate that its nonperformance was excused on any given day.

The issue of the amount of damage incurred by GW resulting from each day's interruption remained a jury question. But on the evidence presented, even viewed in the light most favorable to KN, *Safeway Stores v. Langdon,* 187 Colo. 425, 532 P.2d 337 (1975), GW was entitled to the directed verdict it sought.

Lastly, in view of our ruling on the cross-appeal, we do not address GW's contention that the jury only awarded damages for the 1973–1974, 1974–1975, and 1975–1976 campaigns.

Accordingly, the damages portion of the judgment in favor of GW and against KN is reversed, and the cause is remanded for a new trial on the issue of GW's damages incurred on each day that KN interrupted service to GW during the subject period. The award of prejudgment interest is vacated; the expert's fee is to be reviewed as directed in V *supra;* all other orders and the balance of the judgments are affirmed.

COYTE and VAN CISE, JJ., concur.