ROCKY MOUNTAIN MACHINERY CO.,
Plaintiff-Appellee, Cross-Appellant,

v.

FIRST NATIONAL BANK OF TRINI-
DAD, Defendant-Appellant,
Cross-Appellee,

and

Gary C. Carden and Triad Industries,
Inc., Defendants.

Nos. 83–1486, 83–1509.

United States Court of Appeals,
Tenth Circuit.

July 15, 1985.

Kenneth B. Siegel of Sherman & Howard, Denver, Colo. (Kent J. Lund and Daniel E. Klaus of Sherman & Howard, Denver, Colo., and Louis B. Bruno of Bruno, Bruno & Bahr, P.C., Lakewood, Colo., with him on the brief), for defendant-appellant, cross-appellee.

William G. Imig of Ireland, Stapleton, Pryor & Pascoe, P.C., Denver, Colo. (David P. Temple of Ireland, Stapleton, Pryor & Pascoe, P.C., Denver, Colo., and Robert E. Slota of Murphy & Slota, Bryn Mawr, Pa., with him on the brief), for plaintiff-appellee, cross-appellant.

Before McKAY, SETH and SEYMOUR, Circuit Judges.

SETH, Circuit Judge.

This is an appeal by the defendant from a judgment entered on a jury verdict for the plaintiff in a diversity contract action brought by Rocky Mountain Machinery Co. against the First National Bank of Trinidad. The plaintiff brings a cross-appeal on the trial court's failure to award prejudgment interest.

A customer of the defendant Bank, Mr. Alvin Wiggins, had some property on which he had been mining coal but the venture was unprofitable. This person at the beginning of these transactions owed the defendant Bank a substantial amount of money—an amount which may have exceeded the Bank's loan limit. The Bank President knew a coal miner and another person experienced in the coal business. This Bank officer made arrangements with Mr. Wiggins to give these persons the right to mine coal on the Wiggins property with the expectation that money could thereby be generated to be used to pay to the Bank on Mr. Wiggins' loan. The two individuals had no equipment and not enough money to buy any.

Negotiations began between the two prospective miners, the representative of Rocky Mountain Machinery Co., and the Bank President to procure equipment from Rocky Mountain. It developed that the two prospective miners did not have credit ratings which would warrant the usual rental and sale contracts. Rocky Mountain concluded that it needed some additional protection. Thus it was agreed that Rocky Mountain would provide the equipment and the Bank would control the funds received from the sale of coal and would make the rental payments on the equipment to Rocky Mountain before any other payments were made out of such proceeds.

There were subsequent letters and additions to the agreement. However, it remained basically the same in that the first payments from proceeds from sales after wages were to be applied by the Bank on the machinery rental obligations. The Bank had been provided with a schedule of rental payments due Rocky Mountain and it received the invoices for rentals. The Bank was thoroughly familiar with all the arrangements as it had participated in most of the negotiations and was advised and acquiesced in the others. At trial the Bank President acknowledged the obligation of the Bank under the agreement. He further admitted that the Bank had not made payments to Rocky Mountain out of the proceeds from coal sales.

The evidence showed that the Bank had instead applied the proceeds to its own advantage—thus to use portions to pay first as royalties to Mr. Wiggins which were applied directly by the Bank on his loan from the Bank. The concern of the Bank officer with the Wiggins loan if it was over the Bank's legal limit was understandable, but could not justify the use of the coal proceeds which was made by the Bank.

The Bank also used the funds to permit the miners now known as "Triad" to pay accounts of other Bank customers which were due, and apparently to otherwise have unrestricted use of the money. The Bank thus used the coal proceeds in ways which would benefit the Bank. It further actively misled Rocky Mountain when inquiries were made as to the mining and sales of coal.

The Bank collected slightly over a million dollars from sales of coal under the described arrangement. Of this, some $270,000 was applied on royalties to Mr. Wiggins and the Bank used this money to reduce his loan balance due the Bank as mentioned. Other obligations of Mr. Wiggins were also paid from the proceeds. The Bank paid into Triad's account, without restrictions, $550,000 which apparently went to local creditors. The rest of the million went into Triad's payroll account. The Bank also permitted overdrafts by Triad in substantial amounts.

The Bank paid nothing whatever from the coal proceeds to Rocky Mountain for rental on the equipment used to mine the coal as provided in the agreement. More than enough money was paid to the Bank from buyers of the coal to have enabled the Bank to fully perform under the contract.

There is no substantial question but that the agreement and its terms were established by sufficient evidence. The Bank official who testified acknowledged the existence of the agreement in all its essential provisions as asserted by Rocky Mountain. The evidence further established that the Bank did not disburse the money in accordance with its obligations under the agreement.

The Bank in its post-trial motions and on this appeal argues that there were conditions precedent to its duty to remit the equipment rental payments to Rocky Mountain out of the proceeds from coal sales. The Bank urges that Triad had first to agree to the payments before the Bank had a contractual duty to pay.

■ However, the Bank official who handled the transactions testified that when the agreements were reached no such condition was mentioned. No condition appears in the letters or the basic agreement. Triad, which was the Bank's customer and depositor, was a party to the agreement which provided that the Bank was to receive the coal payments and was to disburse these funds in accordance with the agreement. Triad had thus itself agreed that the Bank make the payments "up front" for equipment rental and directly to Rocky Mountain. The evidence was overwhelming that there was no condition precedent as urged by the Bank.

As the trial court indicated, there was nothing to prevent the Bank from obligating itself to handle the proceeds as the agreement provided regardless of whatever rights the Bank may have had against its depositor by way of set off or otherwise. The Bank undertook this contractual obligation to Rocky Mountain which was not bound by any Bank-depositor relationship. Rocky Mountain was not a depositor, not a customer, and not concerned with the Bank's relations with a depositor, but it could and did rely on its contract with the Bank.

■ The Bank argues that the money was placed by it into Triad's account and the Bank thereafter had no right under general banking law and practice to withdraw funds.

The Bank had obligated itself to handle in a certain way the coal proceeds which it initially received and controlled. This argument of the Bank acknowledges that it failed to secure the authority it now argues was lacking to enable it to perform. If this be so the Bank at the outset did not prepare itself to carry out its obligation but contracted otherwise. It must be assumed that the Bank then knew what it now urges as to its authority. If the Bank did not make the necessary arrangements internally with its depositor-customer Triad to enable itself to perform its obligations to Rocky Mountain it would nevertheless be liable for non-performance. Also, if after receiving the coal proceeds it handled them in a way whereby it lost control over them for whatever reason, it would be liable for not making the agreed application of the funds.

The Bank in the conditions precedent argument, as mentioned herein, seeks to ignore its contractual duty to Rocky Mountain and to argue the Bank-depositor relationship with Triad as some sort of defense. The trial court applied the proper

standards in ruling on the motion for directed verdict made by the Bank on this point. *See Hidalgo Properties, Inc. v. Wachovia Mortgage Co.,* 617 F.2d 196 (10th Cir.); *Champion Home Builders v. Shumate,* 388 F.2d 806 (10th Cir.).

■ The Bank urges that it had a right to set-off proceeds in its hands due the depositor Triad against overdrafts Triad had accumulated in its account. This again overlooks the provisions of the agreement. These overdrafts had, of course, been approved by the Bank. However, the Bank was obligated by the agreement to make a different application of the funds. These funds did not in fact belong nor were they due Triad when received by the Bank to the extent they were obligated to Rocky Mountain. The Bank, Triad and Rocky Mountain had so agreed.

There apparently was no issue of set off in the proceedings as the issue was not raised by the Bank in the pleadings nor was it in the pretrial order. *Trujillo v. Uniroyal Corp.,* 608 F.2d 815 (10th Cir.). No applicable instructions were offered by the Bank on the point. The Colorado statute, Colo.Rev.Stat. § 4–4–401 (1973), nor the doctrine generally, was not applicable to alter the Bank's contractual rights with a non-customer. Thus there was in fact no set-off right upon which the Bank could rely to overcome its obligation under the agreement. Its application of the receipts for coal sales was wrongful as to Rocky Mountain and the jury so found.

No valid grounds have been advanced for appellant Bank to urge error in the instructions. The Bank in fact provided instructions which were given on several points it now urges. The jury simply found the facts against the contentions made by the Bank and did so under proper instructions.

There is no basis whatever for the Bank's contention that the jury was somehow confused. The evidence was clear, the Bank had stipulated that a contract had been agreed upon; the modifications were established; the breach of the agreement by the Bank was gross and was obvious from the testimony of the Bank officer and from the vouchers for coal payments and from other Bank records. The jury under proper instructions awarded an amount which was the total of the rental payments due to Rocky Mountain on the equipment.

■ No argument is made that the Bank was responsible for the equipment rental payments out of its own funds as the Bank seems to infer. The jury found that the Bank was liable by reason of its failure to make the payments out of the coal proceeds paid to it as the contract provided. The Bank had the funds in hand from time to time which should have been paid to Rocky Mountain. The evidence shows that the coal proceeds were instead directly applied by the Bank for its own benefit or were indirectly so applied. The Bank benefitted from the diversion of the funds from Rocky Mountain and in our view this under the Colorado statutes (Colo.Rev.Stat. § 5–12–102 (1973)) is money which was wrongfully withheld and was money which was due. This issue of prejudgment interest is a matter of law. The Colorado statutes do not require that the amount sought in the action be liquidated nor does it matter that the claim was disputed in good faith. *See Great Western Sugar Co. v. Northern Natural Gas Co.,* 661 P.2d 684 (Colo.App.), and *Jasken v. Sheehy Construction Co.,* 642 P.2d 58 (Colo.App.). The money found by the jury to be due, and which was the total of the unpaid rental payments, was money wrongfully withheld by the Bank out of monies in its control and which were otherwise applied for the benefit of the Bank.

Under these circumstances we must conclude that prejudgment interest should have been allowed by the trial court.

The judgment appealed from is affirmed in all respects except as to prejudgment interest which should have been allowed. The case is remanded for the determination of the amount and the allowance of prejudgment interest. IT IS SO ORDERED.