**ARAPAHOE COUNTY PUBLIC AIRPORT AUTHORITY, a political subdivision of the State of Colorado, Petitioner,**

v.

**CENTENNIAL EXPRESS AIRLINES, INC., a Colorado corporation; and Golden Eagle Charters, Inc., d/b/a Centennial Express Airways, Inc., a Colorado corporation, Respondents.**

No. 97SC123.

Supreme Court of Colorado,
En Banc.

April 13, 1998.

Rehearing Denied May 18, 1998.

Brega & Winters, P.C., Ronald S. Loser, Brian A. Magoon, Peter A. Gergely, Denver, for Petitioner.

Bryant & Van Nest, LLC, Mark A. Pottinger, of Counsel, Denver, for Respondents.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *Arapahoe County Public Airport Authority v. Centennial Express Airlines, Inc.,* 942 P.2d 1270 (Colo.App.1996), to determine whether the court of appeals erred in reversing a permanent injunction entered in favor of the plaintiff, Arapahoe County Public Airport Authority (the Authority), prohibiting the defendant, Centennial Express Airlines, Inc., and its wholly owned subsidiary, Golden Eagle Charters, Inc., d/b/a Centennial Express Airways, Inc. (Centennial Express), from conducting scheduled air carrier service in and out of Centennial Airport (Centennial). We reverse.

## I.

Centennial was built in 1967 to serve the growing aviation needs of the Denver metropolitan region and has since become one of the largest and busiest general aviation facilities in the country.[1] Centennial is located fourteen miles southeast of downtown Denver and sits on approximately 1,200 acres of land in Arapahoe and Douglas Counties. In 1975, Arapahoe County established the Authority pursuant to the Public Airport Authority Law, sections 41–3–101 to –108, 17 C.R.S. (1973), to own and operate Centennial as a political subdivision of the State. The Authority owns all of the land and facilities at Centennial except for two runways which it leases from Arapahoe County.

To fund airport construction and operations, the Authority has accepted approximately $30.1 million in federal grants. As a condition to accepting these grants and pursuant to federal law, the Authority has given its assurance that it "will make its airport available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses." A separate assurance provides that the Authority "may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public."

Local, regional, and national planning schemes designate Centennial as a general aviation reliever airport for Denver's primary air carrier airports, Stapleton International (Stapleton), which closed in February of 1995 and Denver International (DIA), which opened upon Stapleton's closure. Locally, resolutions passed by the Board of County Commissioners of Arapahoe County in 1966 approved funding for the construction of a general aviation airport. Newspaper accounts of open meetings held following this funding approval indicate that county officials hoped to lure new industry and expand the county's tax base by building an airport to "serve general aviation, not scheduled carriers or military planes." A new airport would also ease general aviation overcrowding at Stapleton. In one news report, the Federal Aviation Administration (FAA) area director proclaimed that the airport was "a much needed reliever terminal for general aviation."

Regionally, the Denver Regional Council of Governments (DRCOG), a planning organization of county and municipal governments, has adopted several aviation plans that guide the development and operation of airports in the Denver area. Specifically, the 2010 Regional Aviation System Plan (2010 Plan), which was published by DRCOG in 1989, provides that Stapleton is the only commercial air carrier airport in the region and designates Centennial "as a non-commercial passenger, transport-category, general aviation reliever airport." Similarly, the Regional Aviation System Planning Program Data File, which was published by DRCOG in 1991, provides that Stapleton is the "air car-

---

1. In 1988, Centennial ranked as the twenty-eighth busiest airport in the United States. One year later, Centennial was fourth nationally in based aircraft. In 1995, Centennial was the second busiest general aviation airport in the country.

rier facility for the Denver region" and categorizes Centennial "as a non-commercial passenger, transport category, G.A. reliever."[2]

Nationally, the National Plan of Integrated Airport Systems (NPIAS), which was presented to Congress by the Secretary of Transportation in 1991, does not include Centennial in its summary of Colorado's primary and commercial service airports. Instead, the NPIAS lists Centennial as a reliever airport intended to alleviate general aviation congestion at Denver's primary commercial airport through 1999.

Due to its planned role as a general aviation reliever and strong opposition from citizens who live near the airport, scheduled passenger service has never been authorized at Centennial. While fixed-base air taxi and charter flights are permitted, Centennial's master plan, which was published in 1981, provides that air taxi, charter flights, and military use constitute less than one percent of the airport's total operations. Because scheduled passenger service has never been permitted, Centennial presently operates without a terminal, baggage system, or passenger security system.

Despite Centennial's lack of facilities, private efforts have been made to bring scheduled passenger service to the airport. In response, the Authority has increased efforts to prohibit scheduled passenger service. On July 21, 1993, the Authority sent a letter to the United States Department of Transportation (USDOT) asserting that the Authority did not have to approve applications for scheduled passenger service and asking US-DOT for its opinion on the issue. On September 4, 1993, the Authority also amended the "Minimum Standards for Commercial Aeronautical Activities" (the Standards) governing operations at Centennial. These Standards now define "Airport Purpose" as

any Authority action, undertaking or development that is consistent in maintaining the non-certificated status of the Airport

and in preserving the Airport funding category as a "Reliever Airport" serving general aviation users. *Under no circumstances shall the Airport Purpose include scheduled passenger services.*

(Emphasis added.)

On December 20, 1994, Centennial Express began scheduled passenger service out of Centennial to Dalhart, Texas. Centennial Express has a valid air carrier certificate issued by the FAA.[3] At the time of its maiden flight, Centennial Express was aware of the Authority's ban on scheduled passenger service but chose to delay notifying the Authority until the return flight from Dalhart. Centennial Express also issued a press release announcing that it would soon provide scheduled passenger service from Centennial to Amarillo, Colorado Springs, Grand Junction, and other Western Slope airports in 1995. Additionally, Centennial Express planned to begin regular jet flights from Colorado Springs to Chicago, Kansas City, Houston, Dallas, Phoenix, Los Angeles, San Francisco, and Seattle.

The following day, the Authority filed suit in Arapahoe County District Court (the district court) seeking a temporary restraining order and preliminary and permanent injunctions preventing Centennial Express from conducting scheduled passenger service out of Centennial. On December 22, 1994, the district court granted the Authority's request for a temporary restraining order, concluding in part that

[r]eal, immediate, and irreparable injury may be prevented if [Centennial Express is] enjoined from conducting and expanding illegal scheduled passenger service at the Airport. [Centennial Express has] made a unilateral decision to conduct illegal scheduled passenger service at the Airport. [Centennial Express has] flaunted the law by disregarding the Airport's Minimum Standards. [The Authority] man-

---

2. In November of 1995, after the facts giving rise to this dispute arose, DRCOG published the 2020 Regional Aviation System Plan (2020 Plan) to update the 2010 Plan. The 2020 Plan refers to Centennial as a "transport-category, general aviation airport, [that] is a designated reliever to DIA."

3. The FAA certificate authorized Centennial Express to carry up to 30 passengers for four scheduled round trips per week, per destination, in aircraft weighing less than 75,000 pounds.

ages the Airport. Indeed, [the Authority's] reason to exist turns on its ability to govern and manage the Airport. If the requested relief is not provided, [the Authority] will be stripped of its ability and authority to manage the Airport.

On December 23, 1994, more than seventeen months after the Authority's initial request, USDOT responded to the Authority's letter as to whether it could ban scheduled passenger service at Centennial. In relevant part, the USDOT's letter provides as follows:

In addressing similar cases in the past, FAA has found it arbitrary to exclude any particular class of service due to factors that are not related to the impacts of that service.

Although the material that [the Authority] submitted states that approval of scheduled service would increase the number of operations and passengers at Centennial Airport, there was insufficient information submitted with [the Authority's] letter to demonstrate that a restriction of any particular category of operation could be adequately supported. For example, although individual factors are not alone likely to be dispositive, [the Authority's] letter does not discuss the nature and extent of any resulting environmental impact, congestion, or effect on airport facilities such as the terminal or parking, that would result from the initiation of scheduled service.

Later, the opinion letter states that the Authority's letter

also raises a policy issue relating to how to harmonize several important goals—allowing the citizens of a region to plan and manage their aviation resources on a regional basis, while at the same time preserving and enhancing the performance of the national aviation system and ensuring that statutory and regulatory requirements associated with use of federal grant funds are not violated. . . . We firmly sup-

port regional planning and decision-making and strongly believe that local governments should, wherever possible, plan, develop and operate their transportation systems in an integrated and regional context, consistent with applicable federal law. . . .

[W]here the volume of air traffic is approaching or exceeding the maximum practical capacity of an airport, an airport owner may designate a certain airport in a multiple airport system (under the same ownership and serving the same community) for use by a particular class of aircraft so long as the owner can assure that all classes of aeronautical needs can be fully accommodated within the system of airports under the owner's control. . . .

The issue that this raises is whether [USDOT] should change its policy to extend the flexibility now afforded to multiple airports under joint ownership to individually-owned multiple airports which are planned and operated under a regional agreement. . . . Because this would be a significant policy change, full consideration by the public and the aviation community is warranted. Therefore, we will be initiating, early next year, a process to obtain a full range of views on this issue.

On January 10, 1995, after conducting several hearings, the district court entered a permanent injunction prohibiting Centennial Express from conducting scheduled passenger service out of Centennial.[4] Centennial Express appealed and also filed a complaint with the Federal Aviation Administration (FAA).[5] The court of appeals reversed the district court's ruling, concluding that the Authority's regulation prohibiting scheduled passenger service was preempted by 49 U.S.C. § 41713(b)(1) (1994). The court of appeals also held that the district court should have left the question of whether the Authority could prohibit scheduled passenger service to the federal administrative agencies' primary jurisdiction.

---

4. At a January 5, 1995, hearing, the parties stipulated that the district court would rule on the issue of permanent injunctive relief in order to expedite this case for appeal. For this reason, no preliminary injunction was issued in this case.

5. Centennial Express's FAA complaint was the second challenging the Authority's ban on scheduled passenger service. The first complaint had been filed by an individual who is not a party to this action. Both complaints are still pending.

## II.

At the outset, we must determine whether this court should defer to the federal agencies' holding concurrent jurisdiction over this case. The doctrine of primary jurisdiction, or the deference doctrine, calls for judicial deference in cases involving technical questions of fact uniquely within an agency's expertise and experience, or in cases where uniformity and consistency require administrative discretion. *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976); *Columbia Gas Transmission Corp. v. Allied Chem. Corp.,* 652 F.2d 503, 519 n. 14 (5th Cir.1981); *Great Western Sugar Co. v. Northern Natural Gas Co.,* 661 P.2d 684, 690 (Colo.App.1982). No fixed formula exists for deciding when to invoke this doctrine, but it should be utilized reluctantly where the issue is strictly a legal one that is within the conventional competence of the courts. *See Great Western Sugar,* 661 P.2d at 690.

The issues in this case do not involve complex questions of fact. Rather, we have been asked to consider whether the district court properly enjoined Centennial Express from conducting scheduled passenger service out of Centennial. As defenses, Centennial Express claims that (1) the Authority's regulation prohibiting scheduled passenger service at Centennial is preempted by federal law and (2) the ban on scheduled passenger service violates the terms of the Authority's federal grant assurances. In our view, these legal and interpretive questions do not "go beyond the understanding of judges" or lay "at the heart of the task assigned the agency by Congress." *See Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580–81 (1st Cir.1979).

Additionally, the FAA has yet to rule on either of the complaints despite the fact that they were filed more than three years ago. Similarly, although the USDOT opinion letter alludes to "initiating, early [in 1995], a process to obtain a full range of views on" its policy regarding individual airport participation in regional airport planning, we have no indication from the parties or USDOT that such efforts have begun. Because there is a strong public interest in resolving this case promptly, we refuse to defer to administrative action which is of "uncertain aid and uncertain speed." *See id.* at 581.[6]

Centennial Express also points to the USDOT opinion letter in arguing that deference is warranted in this case. In *Banner Advertising, Inc. v. People,* 868 P.2d 1077, 1083 (Colo.1994), we addressed the level of deference we must afford an opinion letter issued by the FAA. Specifically, we explained:

> [T]he opinion of the FAA's chief counsel ... was not reached as a result of hearing adversary proceedings in which he found facts and reached conclusions of law. It is in no way binding on a court. Nevertheless, the letter was written as part of the official duties of the chief counsel, and is based on a level of more specialized expertise than most judges possess, so we may properly look to it for guidance. While opinion letters from administrative agencies are not binding authority, they can be used as persuasive authority.

*Id.* Contrary to *Banner,* where we chose to defer to the agency's letter, we believe the USDOT's opinion letter in this case does not require deference. First, the letter is brief, contains no federal preemption analysis, and fails to cite any federal cases for its propositions. Second, the letter is inconclusive because it states that the Authority submitted "insufficient information" on the impact

---

**6.** Contrary to the court of appeals, we do not view *New England Legal Foundation v. Massachusetts Port Authority,* 883 F.2d 157, 171 (1st Cir.1989), as dispositive here. In that case, the Second Circuit held that the district court erred in ruling on the merits of a case involving the imposition of landing fees at Boston's Logan Airport when the same issue was pending before the FAA. In the Second Circuit's view, the following federal actions, in addition to an FAA complaint, justified deferring to the FAA in that case:

(1) the Secretary of Transportation had ordered a formal investigation into the complaint; and (2) the United States, as *amicus curiae,* had urged the district court to issue an injunction preserving the status quo until the USDOT's investigation was complete. *See id.* In this case, we are aware of no formal investigation into the FAA complaints and have received no indication from the federal government that reviewing the merits of this case is, in its view, inappropriate.

scheduled passenger service would have at Centennial. Third, because the opinion letter is only persuasive authority, it is not binding on this court. *See id.*

In this case, Centennial Express began scheduled passenger service in clear defiance of the Authority's regulations, before the US-DOT's opinion letter was issued, and before filing its FAA complaint. Nevertheless, Centennial Express asserts that even though it has disregarded valid regulations passed pursuant to state law, we must defer to the federal agencies' concurrent jurisdiction. We disagree. If we defer to the federal agencies, we would affirm Centennial Express's course of conduct and foreclose the Authority's only avenue of relief. This would allow future airport users to unilaterally conduct and continue operations in violation of airport rules so long as they implicate federal jurisdiction in some way. Under these circumstances, we refuse to defer to the federal agencies' concurrent jurisdiction.

### III.

■ Centennial Express argues that the ban on scheduled passenger service is preempted by federal law. We disagree.

Congress radically altered the character of commercial aviation when it amended the Federal Aviation Act and deregulated the airline industry pursuant to the Airline Deregulation Act of 1978(ADA). *See* Pub.L. 95–504, 92 Stat. 1705. In so doing, Congress determined that market forces were better suited for promoting efficiency, innovation, low prices, variety, and quality in the air transportation industry. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378, 112 S.Ct. 2031, 2033, 119 L.Ed.2d 157 (1992). However, the absence of federal regulation caused concern in Congress that individual states would pass inconsistent and conflicting laws regulating the airline industry. *See* H.R. Rep. 95–1211, at 15–16 (1978)

*reprinted in* 1978 U.S.C.C.A.N. 3737, 3752; *see also Margolis v. United Airlines, Inc.,* 811 F.Supp. 318, 320–21 (E.D.Mich.1993). Consequently, the ADA included a provision that preempted all state laws relating to the rates, routes, or services of an interstate air carrier. *See* 49 U.S.C. § 1305(a)(1) (Supp. III. 1979). Currently, 49 U.S.C. § 41713(b)(1) (the ADA preemption provision) provides that a political subdivision of a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." [7]

Two cases from the United States Supreme Court offer guidance on the scope of the ADA preemption provision. In *Morales,* several airlines filed suit against the State of Texas seeking injunctive relief prohibiting enforcement of state regulations pertaining to airline fare advertising. The airlines argued that the regulations were preempted by the ADA preemption provision. Relying upon cases in which the Supreme Court interpreted a similarly worded preemption provision in the Employee Retirement Income Security Act of 1974 (ERISA), the Court determined that the ADA preemption provision expressed a broad preemptive purpose that included all "State enforcement actions having a connection with or reference to airline rates, routes, or services." *Morales,* 504 U.S. at 383–84, 112 S.Ct. at 2037; *see also American Airlines, Inc. v. Wolens,* 513 U.S. 219, 223, 115 S.Ct. 817, 821, 130 L.Ed.2d 715 (1995). The *Morales* Court noted, however, that preemption was inappropriate where the state action affects airline rates, routes, and services "in too tenuous, remote, or peripheral a manner." *See Morales,* 504 U.S. at 390, 112 S.Ct. at 2040; *Wolens,* 513 U.S. at 224, 115 S.Ct. at 822.

In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* 514 U.S. 645, 654–56, 115 S.Ct.

---

7. Congress reenacted Title 49 in 1994. Previously, 49 U.S.C. § 1305(a)(1) provided in relevant part that "no State ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any carrier." Although the language of this statute differs slightly from 49 U.S.C. § 41713(b)(1), Congress intended

the revision to make no substantive change. *See American Airlines, Inc. v. Wolens,* 513 U.S. 219, 223 n. 1, 115 S.Ct. 817, 821 n. 1, 130 L.Ed.2d 715 (1995). Therefore, even though many of the cases cited in this opinion interpret 49 U.S.C. § 1305(a)(1), this opinion refers to both § 1305(a)(1) and § 41713(b)(1) as the ADA preemption provision.

1671, 1676–77, 131 L.Ed.2d 695 (1995), the Supreme Court explained that it may have interpreted the "relate to" language in prior ERISA cases too broadly.[8] Specifically, the Court explained:

> If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere. But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality. That said, we have to recognize that our prior attempt to construe the phrase "relate to" does not give us much help drawing the line here.

*Id.* at 655, 115 S.Ct. at 1677 (citation and internal quotation marks omitted). Instead, the Court explained that it must address ERISA preemption cases "with the starting presumption that Congress does not intend to supplant state law." *Id.* at 654, 115 S.Ct. at 1676. With this presumption in mind, the Court then explained that it "simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S.Ct. at 1677.

Despite the broad reach the *Morales* Court gave the ADA preemption provision, the *Travelers* decision establishes a less literal method for determining whether state regulations concerning aviation are preempted. Specifically, *Travelers* counsels that we should first presume "that Congress does not intend to supplant state law." *Id.* at 654, 115 S.Ct. at 1676. Then, we must review the objectives of the statute in defining "the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S.Ct. at 1677.

Turning to the facts of this case, we believe that the Authority's ban on scheduled passenger service is not preempted. Because the regulation concerns an area of local and regional planning, it will not lead to inconsistent or conflicting state regulations.[9] Therefore, the regulation does not undermine the purpose of the ADA preemption provision.

The Authority's regulatory ban on scheduled service also survives scrutiny under the plain meaning of the ADA preemption provision because it does not regulate the manner

---

**8.** Although *Travelers* does not concern aviation law, *Morales* explains the connection to ERISA cases as follows:

> [W]e have held that a state law relates to an employee benefit plan, and is pre-empted by ERISA, if it has a connection with, or reference to, such a plan. Since the relevant language of the ADA is identical, we think it appropriate to adopt the same standard here.

*Morales*, 504 U.S. at 384, 112 S.Ct. at 2037 (citation and quotation marks omitted). *Travelers* is therefore highly instructive on the Supreme Court's current approach towards interpreting "identical" language in the ADA preemption provision. *Id.*

**9.** Besides planning Centennial's operations on a local level, the Authority's ban on scheduled passenger service also reflects the airport's regional role as a general aviation reliever for Denver's primary commercial airport. Other federal statutes indicate a willingness to cooperate with and defer to this type of local and regional aviation planning. *See* 49 U.S.C. § 40101(a)(8) (1994); 49 U.S.C. § 47101(g) (1994). Specifically, 49 U.S.C. § 47101(g) provides in pertinent part that

> the Secretary of Transportation shall cooperate with State and local officials in developing airport plans and programs that are based on overall transportation needs. The airport plans and programs shall be developed in coordination with other transportation planning and considering comprehensive longrange land-use plans and overall social, economic, environmental, system performance, and energy conservation objectives. The process of developing airport plans and programs shall be continuing, cooperative, and comprehensive to the degree appropriate to the complexity of the transportation problems.

Without any indication that Congress intended to disregard local and regional aviation planning altogether, preemption is unwarranted in this case. *See Local 926, Int'l Union of Operating Eng'rs, AFL–CIO v. Jones,* 460 U.S. 669, 676, 103 S.Ct. 1453, 1459, 75 L.Ed.2d 368 (1983) (explaining that "in the absence of compelling congressional direction," preemption is unwarranted when "the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that ... it could not be inferred that Congress intended to deprive the State of the power to act").

in which airport users conduct their business. We disagree with the court of appeals that prohibiting scheduled passenger service "relates to" airline services because it does not concern typical service-oriented tasks such as ticketing, boarding procedures, providing meals and drinks to passengers, and baggage handling. *See Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir.1995). Similarly, the Authority is not regulating airline fares or routes because the ban on scheduled service does not delineate what airlines can charge or where they can fly.

While Centennial Express has raised preemption as a defense to the Authority's ban on scheduled passenger service, we believe the Authority's actions more appropriately fall under 49 U.S.C. § 41713(b)(3) (1994) (the proprietor's exception), which provides conclusive support for the Authority's position. That section provides that the ADA preemption provision does not limit a political subdivision that owns or operates an airport "from carrying out its proprietary powers and rights." [10]

Federal courts have considered the scope of the proprietor's exception in two significant areas of airport management. The first, and most extensive, of these areas concerns an airport proprietor's ability to regulate airport noise. These cases hold that because they may be held liable for excessive noise, airport proprietors may restrict aircraft operations to accommodate permissible noise levels under the proprietor's exception. *See City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 635–36 n. 14, 93 S.Ct. 1854, 1861 n. 14, 36 L.Ed.2d 547 (1973); *Santa Monica Airport Ass'n v. City of Santa Monica,* 659 F.2d 100, 104 (9th Cir.1981); *British Airways Bd. v. Port Auth. of New York,* 558 F.2d 75, 84 (2d Cir.1977).

The second area of airport management that has been deemed to fall under the proprietor's control are perimeter rules, which restrict a commercial flight's maximum radius in order to limit an airport's ground congestion and divert long-haul traffic to other regional airports. *See City of Houston v. Federal Aviation Admin.,* 679 F.2d 1184, 1196 (5th Cir.1982); *Western Air Lines, Inc. v. Port Auth. of New York & New Jersey,* 658 F.Supp. 952, 958 (S.D.N.Y.1986), *aff'd,* 817 F.2d 222 (2d Cir.1987). In contrast to cases affirming noise restrictions, these cases uphold perimeter rules even though they have no relationship to an airport's liability exposure. As one of these courts has reasoned,

> although questions of permissible noise regulation predominate in the courts, other proprietor-imposed regulations are presently accepted as valid exercises of proprietary powers. A proprietor's interest in regulating ground congestion at its airports would appear to be at the core of the proprietor's function as airport manager, perhaps even more so than the regulation of noise; and the ability of a proprietor ... to allocate air traffic in its three airport system is important to the advancement of this interest.

*Western Air Lines,* 658 F.Supp. at 957 (internal quotation marks omitted).

There are no cases that address the specific question posed by the present case. Nevertheless, we believe that an airport proprietor's ban on scheduled passenger service falls squarely within the proprietor's exception. While regulations concerning aircraft noise and ground congestion restrict the manner in which airport users conduct their operations, a ban on scheduled service seeks to accomplish a more fundamental goal in setting the boundaries of permissible operations at the airport. The power to control an airport's size exists at the core of the proprietor's function and is especially strong where, as here, the prohibited use has never been allowed, or even contemplated. *See id.; see also Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 97 (2d Cir.1986) (finding that, under the proprietor's exception, a municipality could prevent a seasonal operator from expanding its operations to include year-round service).

10. For purposes of applying the proprietor's exception, a proprietor has been defined as one possessing or controlling ownership, operation, promotion, and the ability to acquire necessary approach easements. *See San Diego Unified Port Dist. v. Gianturco,* 651 F.2d 1306, 1317 (9th Cir.1981). Clearly, the Authority is Centennial's proprietor under this definition.

By unilaterally commencing scheduled passenger service out of Centennial, Centennial Express has essentially proclaimed that the Authority, a political subdivision of the state, lacks the power to define and limit the scope of permissible operations at its airport. However, Colorado law clearly gives the Authority this power. *See* § 41–3–106(1)(h), 11 C.R.S. (1997).[11] Accordingly, the Authority's ban on scheduled passenger service is a valid exercise of its proprietary powers that is not preempted by federal law.

## IV.

■ Centennial Express also argues that the Authority has violated the terms of the federal grant assurances under which it has agreed to "make its airport available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses." *See* 49 U.S.C. § 47107(a) (1994) (providing that project grant application may be approved only if Secretary of Transportation receives satisfactory written assurances). We disagree.

While the grant assurances prohibit discrimination among different types, kinds, and classes of aeronautical uses, we refuse to construe them so broadly that airport proprietors must accommodate every possible aeronautical use. By the terms of the assurances, an airport proprietor who has accepted federal funding must make its airport available on "fair and reasonable terms without unjust discrimination." The anti-discrimination provision therefore prohibits airport owners from using their proprietary power to grant one operator access while denying access to, or imposing unfair terms on, a similarly situated operator.[12] Here, the Authority is not discriminating against a particular operator because the ban on scheduled passenger service applies to all airport users equally.

Furthermore, a separate assurance allows airport proprietors to prohibit specific aeronautical uses "if such action is necessary for the safe operation of the airport or necessary to service the civil aviation needs of the public." The Authority's ban on scheduled passenger service is necessary to ensure the safe operation of the airport. Although it initially plans to operate on a small scale, Centennial Express has ambitions to become much larger. Opening Centennial's doors to Centennial Express would also require the Authority to make Centennial available to other airlines who wish to provide scheduled passenger service. *See* 49 U.S.C. § 47107(a)(4) (1994). These new operators, some of whom may find conditions at Centennial more appealing than DIA, promise to bring increased aviation traffic to an already congested airport. This increased congestion is sure to have an impact on airport safety. Increased passenger traffic also requires additional facilities such as a terminal, security and baggage systems, which are currently lacking at Centennial. Without these facilities, the airport would become unsafe for passenger use.

Local, regional, and national aviation planning also strongly indicates that the aviation needs of the public are better served if Centennial continues to function as a general aviation reliever airport. The sudden imposition of scheduled passenger service and a

---

**11.** Section 41–3–106(1)(h) provides in part that the Authority has the power

to provide rules and regulations governing the use of such airport and facilities and the use of other property and means of transportation within or over said airport, landing field, and navigation facilities … and to exercise such powers as may be required or consistent with the promotion of aeronautics and the furtherance of commerce and navigation by air[.]

**12.** In *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1029 (N.D.Tex.1973), the court determined that it is discriminatory for an airport proprietor to ban scheduled passenger service in order to serve general aviation exclusively. However, we view that case as offering little support for Centennial Express's position. *City of Dallas* involved a completely different regulatory setting because that case was decided five years before deregulation fundamentally changed the manner in which airlines, and airports, conducted their operations. Further, *City of Dallas* concerned a ban enacted *after* that airport proprietor had previously allowed scheduled passenger operations at the airport. Therefore, facilities and procedures were already in place to accommodate scheduled passenger service. Such is not the case at Centennial, where scheduled passenger service has never been permitted.

resulting increase in commercial operations at Centennial would disrupt this planning scheme and force general aviation operators out of this valuable reliever airport. *See* 49 U.S.C. § 47102(18) (1994) (defining a "reliever airport" in part as an airport designated "to provide more general aviation access to the overall community"). Currently, Centennial is congested and accommodates the majority of the region's general aviation demand while DIA continues to operate well below capacity.[13] A shift in commercial operations from DIA to Centennial would result in more of a disparity in the allocation of aircraft operations among the region's airports. *See City of Houston*, 679 F.2d at 1191.

The Authority's regulation prohibiting scheduled passenger service does not discriminate against individual airport users. Furthermore, the ban on scheduled passenger service "is necessary for the safe operation of the airport" and services "the civil aviation needs of the public." For these reasons, the Authority has not violated the terms of the federal grant assurances.

## V.

The Authority, as the owner and operator of Centennial, has the power to enact regulations which prohibit scheduled passenger service at its airport. This regulatory ban is not preempted by federal law and does not violate the terms of grant assurances that the Authority has given to the federal government. We therefore hold that the district court properly enjoined Centennial Express from conducting scheduled passenger service out of Centennial. Accordingly, we reverse the court of appeals and remand with directions to reinstate the district court's order.

SCOTT, J., concurs and specially concurs.

BENDER, J., dissents and MARTINEZ, J., joins in the dissent.

HOBBS, J., does not participate.

Justice SCOTT concurs and specially concurs:

We granted certiorari and ordered briefing by the parties regarding two questions:

(1) Whether a political subdivision of the State, which owns and operates a general aviation reliever airport, and which has never permitted scheduled passenger service, may prohibit scheduled passenger service under state and federal law.

(2) Whether a state court may determine the proprietary powers of a political subdivision of the State, which owns and operates a general aviation reliever airport, to ban scheduled passenger service.

In answer to the first question, like the majority, I conclude that a state political subdivision, Arapahoe County Public Airport Authority (the Authority), which owns and operates a general aviation reliever airport without a terminal and passenger security system, may prohibit scheduled passenger service. My response to the second question is predicated on the answer to the first: Yes, in order to effect a prohibition on scheduled passenger service and to protect its proprietary interests, the Authority may obtain the aid of our state courts.

I write separately, however, to make clear that, in my view, because the Federal Aviation Administration (FAA) has not acted, it is inappropriate at this time to conclude that any such prohibition by the Authority is preempted. Likewise, I believe it would not be proper or prudent to withhold judicial review on this record in light of the conduct of Centennial Express Airlines, Inc. (Centennial), or under the assumption the FAA will act.

Because I fail to see how the state injunction interferes with any agency action or otherwise exercises jurisdiction in excess of what is necessary to stay the actions of Centennial, which threaten the proprietary interests of a state agency, I find no error in the district court orders. Consequently, I join the opinion of Chief Justice Vollack to reverse the judgment of the court of appeals.

13. DRCOG's 2020 Plan explains that in 1995, DIA was "currently operating with five of the 12 planned runways and 87 of the planned 206 gates."

## I.

State courts generally have concurrent jurisdiction with the federal courts to decide questions of federal law. *See Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816). I can see no reason why a state court's exercise of concurrent jurisdiction over a particular set of questions would be displaced because a party before the court subsequently initiates additional proceedings with a federal agency that has concurrent jurisdiction over those questions. Therefore, I have no trouble concluding that the district court had the power to decide both the state and federal questions necessary to resolve this case with injunctive orders issued on the merits.

## II.

The claim raised by the Authority in the district court was based principally on state law. Indeed, few can question that the Authority plainly has the power to exclude scheduled passenger service from Centennial Airport, unless, of course, Congress preempts state laws permitting such a prohibition, *see* maj. op. at 592–593, 594–596; dissenting op. at 602 (Bender, J.); *see also Banner Advertising, Inc. v. People of the City of Boulder,* 868 P.2d 1077, 1080 (Colo. 1994), which Congress has not done.

In addition, preemption may occur pursuant to a federal statute authorizing the FAA, by formal agency action, to preempt state law. However, unless the FAA acts within its defined authority, no preemption results. It is uncontroverted that the FAA has not acted.[1]

In that vacuum, on December 22, 1994, the district court first issued a temporary restraining order (temporary order). The temporary order was, by its terms, an order that "would preserve the status quo pending a trial on the merits." As the court explained, "[t]he status quo is that no scheduled passenger service is allowed at the Airport.... Granting [the] order would preserve the status quo." Thus, the court ordered Centennial "to refrain immediately from conducting and/or expanding scheduled passenger service at Centennial Airport."

Subsequently, the district court issued its Permanent Injunctive Order of January 10, 1995. However, as I read the court's order, it has self-imposed limitations worthy of note. Building upon the temporary order, the permanent injunction states that it "preserve[s] the status quo[,] no scheduled passenger service," and that it "PERMANENTLY ENJOINS [Centennial] ... to *refrain immediately* from conducting scheduled passenger service at Centennial Airport *so long as such use is prohibited by the Minimum Standards* of the Arapahoe County Public Airport Authority." (Emphasis added.)

Here, in the absence of FAA action, the Minimum Standards of the Arapahoe County Public Airport Authority continue to prohibit scheduled passenger service. I therefore agree that, under these circumstances, the district court did not err when it issued its injunction barring Centennial from conducting scheduled passenger flights based on the state law grounds urged by the Authority.

---

**1.** For purposes of this opinion, I am willing to assume that the FAA has, by statutory grant, the power to preempt the Authority's regulations. Moreover, under the grant agreements, the FAA may also be able to prevent the Authority from barring scheduled passenger service pursuant to the various assurances or contract clauses under the terms of the grant agreement. *See* 14 C.F.R. § 16.1—16.307 (establishing rules of practice for complaints involving violations of FAA regulations and grant assurances). The FAA is obligated to enforce its grant agreements and, where necessary, to compel compliance by its various grant recipients. *See* 14 C.F.R. § 151.7(a) (providing that FAA may authorize grant funding only where the FAA administrator is satisfied grant assurances have been or will be met).

Hence, the FAA may attempt to invoke the assurances or contract clauses of the grant agreement as a bar to the Authority's actions based on a breach of contract theory. Of course, if the FAA is unable to enforce the grant agreements administratively or the Authority wishes to challenge the FAA action, the matter must be litigated in federal court because the United States would be a party. Notwithstanding the assurances under the grant agreement, in the event a grantee violates FAA regulations, the agency might also commence an enforcement proceeding under the FAA's other regulations. Nonetheless, the limiting factor in any preemption analysis here is the failure of the FAA to act and the fact no party has turned to the federal courts to compel FAA action.

Consistent with our holding today, we have previously recognized that even where a court does *not* have jurisdiction to decide a controversy on the merits, it may nonetheless issue an injunction to preserve the status quo pending resolution of the dispute in an appropriate forum. *See Hughley v. Rocky Mtn. Health Maintenance Organization, Inc.*, 927 P.2d 1325, 1330 (Colo.1996) (court may enter injunction to preserve status quo despite statutory divestiture of jurisdiction over merits of dispute submitted to arbitration); *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. District Court*, 672 P.2d 1015, 1018–19 (Colo.1983) (same).

In my view, there can be little question as to whether the district court had jurisdiction over the state law issue and was obligated to exercise the state judicial power. Our constitution does not contemplate that a trial court can, as executive departments of government may, avoid a matter properly before it solely by exercise of its discretion. Colo. Const. Art. II, § 6. ("Courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered without sale, denial or delay.") As the United States Supreme Court held in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821):

> We cannot pass [a case] by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

### III.

In sum, an injunction was appropriate to protect the proprietary interests of the Authority. Therefore, I too would reverse the judgment of the court of appeals. Accordingly, I join the majority in holding that the district court's order enjoining Centennial to preserve the status quo was appropriate to resolve the dispute before that court.

Justice BENDER dissenting:

The majority holds that the Arapahoe County Airport Authority's (Authority) ban on scheduled passenger service is not preempted by 49 U.S.C. § 41713(b)(1) (1994) because the ban does not relate to rates, routes, or services. *See* maj. op. at 595. The majority also determines that the ban is not preempted because it falls within the proprietary powers exception to preemption set forth in 49 U.S.C. § 41713(b)(3) (1994), and that the ban is valid because it does not violate federal funding regulations. *See id.* at 595, 596. The majority reasons that the district court's exercise of jurisdiction in this case is appropriate because the state court system need not defer to the Federal Aviation Administration (FAA) of the Department of Transportation (DOT) regarding the applicability of the proprietary powers exception and the validity of this state regulation under federal funding requirements. *See id.* at 592.

I agree with the court of appeals' decision that the Authority's ban on scheduled passenger service is preempted by federal law, and that the applicability of the proprietary powers exception to the preemption statute should be determined by the FAA in keeping with the doctrine of primary jurisdiction. I would additionally hold that the state court system should defer to the FAA on the allegations of federal funding violations. Therefore, I believe the court of appeals was correct to reverse the injunction entered by the district court. While I agree with the majority that state courts and the FAA possess concurrent jurisdiction over the applicability of the proprietary powers exception and the question of whether the Authority's ban violates federal grant assurances, I would not address either issue and would defer to the FAA because both issues present important policy considerations properly resolved by a federal administrative agency. In addition, the exercise of jurisdiction by our state court system involves a high risk of inconsistent results between our state system and the federal administrative forum. Thus, I would

affirm the decision of the court of appeals, and I respectfully dissent from the majority opinion.

## I.

Centennial Airport was founded in 1967. Construction of the airport was made possible by $30.1 million in federal grants given in exchange for the Authority's assurances that "the airport will be available for public use on reasonable conditions and without unjust discrimination," 49 U.S.C. § 47107(a)(1) (1994), and that the airport would be "open to all types, kinds, and classes of aeronautical use on fair and reasonable terms without discrimination between such types, kinds, and classes ... [unless] such action is necessary for the safe operation of the Airport or necessary to serve the civil aviation needs of the public." 14 C.F.R. § 152, app. D, ¶ 18 (1997). Use of the airport is governed by state and federal law and by regulations promulgated by the Authority. Because the Authority is a political subdivision of the state, these regulations, entitled "Minimum Standards for Commercial Aeronautical Activities" ("Minimum Standards"), have the force and effect of state law. *See* § 41–3–102, 11 C.R.S. (1997) (the Authority is a political subdivision of the state); *cf.* § 41–3–106(1)(h), 11 C.R.S. (1997) (conferring power to regulate certain airport activities).

The airport was designed as a general aviation airport and therefore lacks the facilities associated with commercial passenger air transport, such as a terminal or baggage system. Nonetheless, the Authority historically has allowed certain types of passenger services—unscheduled passenger services—at the airport. Unscheduled passenger services are those in which the flight times and destinations are not offered to the public in advance. *Cf.* 14 C.F.R. § 119.3 (1997) ("defining scheduled passenger service").[1] Instead, unscheduled passenger services allow an individual to contact the airline and arrange for private transportation, but at a high price. Examples of unscheduled passenger services include air taxis and charter flights. Many of the companies offering unscheduled passenger services at Centennial Airport operate pursuant to a "Part 135" air carrier certificate[2] issued by the FAA. A Part 135 air carrier certificate authorizes the use of airplanes that have up to thirty seats and weigh no more than 75,000 pounds when fully loaded. *See id.* A Part 135 certificate allows an operator to conduct unlimited unscheduled passenger services but limits an operator to conduct no more than four scheduled round trips per week on at least one route between two or more points. *See id.* The Authority permits many other commercial activities, including air cargo, commercial flying clubs, flight training, and sightseeing tours.

Various parties sought the Authority's permission to initiate scheduled passenger service at Centennial Airport and were denied. On July 21, 1993, the Authority sent a letter to the DOT requesting the DOT's opinion on whether the Authority could deny applications for scheduled passenger service without violating federal law. In September of 1994, the Authority amended the Minimum Standards to prohibit scheduled passenger service.[3]

---

1. Although the Code of Federal Regulations does not define "unscheduled operations," a "scheduled operation" is defined as follows:

   [A]ny common carriage passenger-carrying operation for compensation or hire conducted by an air carrier or commercial operator for which the certificate holder or its representative offers in advance the departure location, departure time, and arrival location.

   14 C.F.R. § 119.3 (1997). Hence, an unscheduled service is a similar operation that does not offer flight information in advance. "Common carriage" is a service using aircraft with 30 or fewer seats that weighs no more than 75,000 pounds. *See id.* A "passenger-carrying operation" is a service that provides less than five round trips per week on at least one route between two or more points. *See id.*

2. 14 C.F.R. pt. 135 (1997) is commonly known as Part 135. An operation conducted pursuant to a Part 135 air carrier certificate is restricted to certain types of aircraft as set forth in Part 119. There are numerous other Part 135 air carriers at Centennial Airport. Some of these carriers are operating under an air carrier certificate identical to the one the FAA issued to Centennial Express.

3. The amended version of the Minimum Standards provides, in pertinent part:

   An Air Carrier operator is an entity that provides scheduled passenger services and oper-

Shortly thereafter, the DOT mailed a letter to the Authority in response to the Authority's inquiries. In this letter, the FAA stated that although the information provided by the Authority was not sufficient to allow the FAA to reach a conclusive determination, the exclusion of a particular class of service, such as the Authority's ban on scheduled passenger service, is generally arbitrary and invalid. The FAA then stated that the Authority's ban on scheduled passenger service raised important policy questions regarding harmonizing regional planning with national aviation requirements, and that the FAA would commence a proceeding to "obtain a full range of views on this issue."

Centennial Express operates charter services out of Centennial Airport under an agreement with the Authority in which Centennial Express agreed to use the airfield in accordance with state and federal law and in conformity with the Minimum Standards. On December 20, 1994, Centennial Express obtained a Part 135 air carrier certificate from the FAA. The air carrier certificate authorized Centennial Express to provide scheduled passenger services in the contiguous United States, Alaska, Canada, and Mexico. The certificate further authorized Centennial Express to carry up to thirty passengers for four scheduled round trips per week, per destination. The same day, Centennial Express, acting unilaterally, began its FAA-approved scheduled passenger service on its King Air aircraft,[4] with routes including service to Centennial Airport.

Upon learning that Centennial Express was conducting scheduled passenger service in violation of the Minimum Standards, the Authority filed suit against Centennial Express in district court. The Authority sought a permanent injunction prohibiting Centennial Express from providing scheduled passenger service at Centennial Airport.

> ates under the appropriate [federal aviation regulations] ... with aircraft that provide no more than 30 passenger seats and are within the weight limitations established for the Airport in its Rules and Regulations. (*This category is not consistent with the Airport Purpose and will not be allowed to operate at the Airport unless required by final court order.*)

Centennial Express raised several affirmative defenses. It argued that the Authority's prohibition on scheduled passenger service was not valid because the ban violated the Authority's grant agreements with the federal government by discriminating unjustly between classes of airport users. In its view the Authority's ban discriminated against scheduled passenger service because the Authority permitted unscheduled passenger services in the form of

> charter service, air cargo service, corporate jet service, private aircraft of all sizes and kinds, planes noisier than Centennial Express planes, or planes identical to or larger than Centennial Express planes. [The Authority] does not seek to exclude all holders of Part 135 air carrier certificates, the certificate held by Centennial Express. [The Authority] does not seek to prohibit the frequency of any kind of flight in and out of the Airport, but merely seeks to discriminate against scheduled passenger service.

Additionally, Centennial Express argued that the ban was unenforceable because it was preempted by 49 U.S.C. § 41713(b)(1), which provides in pertinent part:

> *Preemption.* (1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

The Authority countered that the prohibition on scheduled passenger service was not preempted by 49 U.S.C. § 41713(b)(1) because subsection (3) of the same statute contains an exception that allows airport proprietors to promulgate regulations necessary to protect their rights as proprietors. Subsection (3) provides:

(Emphasis in original.)

4. The King Air aircraft is quieter than a number of other aircraft currently in use at the airport. There are at least twenty planes operating out of the airport similar to those used by Centennial Express.

This subsection does not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights.

49 U.S.C. § 41713(b)(3). Centennial Express argued that the proprietary powers exception did not apply because this exception is narrow and does not permit a proprietor to enact discriminatory regulations in direct conflict with federal anti-discrimination requirements.

The district court determined that Centennial Express's operation of scheduled passenger service violated the Minimum Standards. The district court rejected the affirmative defenses raised by Centennial Express, stating that the ban did not constitute unjust discrimination under the federal grant agreements and that the ban was not preempted because it was within the scope of the Authority's proprietary powers.

Centennial Express filed a formal complaint against the Authority with the FAA, alleging that the Authority's ban on scheduled passenger service is invalid because it is discriminatory, in violation of federal funding regulations.[5] Centennial Express also appealed to the court of appeals. The court of appeals reversed, holding that the prohibition was preempted by 49 U.S.C. § 41713(b)(1) and that the applicability of the proprietor's rights exception contained in 49 U.S.C. § 41713(b)(3) was a matter that must be determined by the FAA rather than the state courts. The court of appeals did not address the issue of federal funding. The Authority then petitioned this court for certiorari review.

## II. Preemption

The majority holds that the Authority's ban on scheduled passenger service is enforceable because the ban does not fall within the scope of the express preemption statute, 49 U.S.C. § 41713(b)(1). *See* maj. op. at 594. I disagree.

The Supremacy Clause of the United States Constitution authorizes Congress to enact legislation that preempts state law. *See* U.S. Const. art. VI, cl. 2. Preemption occurs in one of three ways: by express terms, by implication when Congress regulates an area in a comprehensive fashion, or by a conflict between federal and state law. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995).

In 1978, Congress enacted the Airline Deregulation Act ("ADA") which largely deregulated domestic air transport. "To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier.' " *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378–79, 112 S.Ct. 2031, 2033, 119 L.Ed.2d 157 (1992).

In *Morales,* the United States Supreme Court explained that the phrase "relating to" should be interpreted broadly and that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' " are preempted. *Id.* at 384, 112 S.Ct. at 2037. For example, in *Morales,* the court held that state requirements on the airlines' advertisement of fares was preempted. The Court determined that the restrictions would have a significant impact on the airlines' ability to market their product, which in turn would have a significant impact on the fares the airlines charged. Thus, the restrictions "related to" rates and were preempted.

Similarly, the Authority's ban on scheduled passenger service at Centennial Airport significantly impacts the service that Centennial Express provides at the airport and the services available at Centennial Airport to the citizens of our state who wish to travel to the destinations that Centennial Express seeks to serve—Dalhart and Amarillo, Texas; Colorado Springs; and Grand Junction.

The policy underlying the ADA supports the view that the Authority's ban on sched-

---

**5.** To date, the formal complaint is still pending before the FAA.

uled passenger service is preempted. The ban is inconsistent with the ADA's goals of furthering "the availability of a variety of adequate, economic, efficient, and low-priced services," 49 U.S.C. § 40101(4) (1994), and "encouraging entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry." 49 U.S.C. § 40101(13) (1994).

The majority relies upon *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995), for the proposition that the ban does not relate to "services" because the definition of "services" provided by an airline does not include the transportation itself. *See* maj. op. at 594–595. I agree with the majority that *Hodges* is instructive in this case; however, I read *Hodges* to compel the opposite conclusion—that the transportation provided by an airline is a "service":

> Elements of the air carrier service ... include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, *in addition to the transportation itself.*

*Hodges,* 44 F.3d at 336 (emphasis added); *see also Butcher v. City of Houston,* 813 F.Supp. 515, 517–18 (S.D.Tex.1993).[6] Thus, I disagree with the majority's determination that transportation is not a "service" for purposes of 49 U.S.C. § 41713(b)(1).

The majority holds that the ban affects services in " 'too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Morales,* 504 U.S. at 390, 112 S.Ct. at 2040 (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100, 103 S.Ct. 2890, 2901, 77 L.Ed.2d 490 (1983)). It is true that the phrase "relate to" has its limits. For example, in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the Supreme Court held the words "relate to" in the ERISA preemption provision did not displace a state regulation that

required hospitals to assess a surcharge on certain patients. *Id.* at 661, 115 S.Ct. at 1679. The Court determined that the connection between the surcharge and ERISA benefit plans was too remote.

In my view, *Travelers* is not similar to the Authority's ban on scheduled passenger service at Centennial Airport because the ban on scheduled service substantially relates to the services offered by Centennial Express. This connection is significantly greater than the tenuous connection presented in *Travelers.* The Authority's ban is more analogous to the prohibition in *Morales,* which " 'plainly does not present a borderline question.' " *Morales,* 504 U.S. at 390, 112 S.Ct. at 2040 (quoting *Shaw,* 463 U.S. at 100, 103 S.Ct. at 2901); *see also American Airlines, Inc. v. Wolens,* 513 U.S. 219, 226, 115 S.Ct. 817, 823, 130 L.Ed.2d 715 (1995) (stating that frequent flier programs unquestionably "related to" rates for purposes of 49 U.S.C. § 41713(b)(1)).

The Supreme Court instructs us to interpret the words "relate to" in 49 U.S.C. § 41713(b)(1) broadly. *See Morales,* 504 U.S. at 383–84, 112 S.Ct. at 2036–37 (citing numerous cases in which the court emphasized the broad scope of the phrase "relate to"). The majority's determination that the Authority's ban does not "relate to" services is inconsistent with this mandate. For the above reasons, I would hold that the Authority's ban on scheduled passenger service "relates to" services and is explicitly preempted by 49 U.S.C. § 41713(b)(1).

## III. Doctrine of Primary Jurisdiction

The majority chooses to address the scope of the proprietary powers exception and Centennial Express's assertion that the Authority's ban is unenforceable because it conflicts with the Authority's federal funding assurances. The majority chooses not to defer to the FAA on these issues, in part because of the failure of the FAA to act promptly in this

---

6. The *Butcher* court stated:

> [O]ne can imagine the effect of different states requiring a certain frequency of airline service to certain of their cities, or mandating that airline service be nonstop between certain cities.... These kinds of "services" ... are dis-

> tinctively incident to the provision of airline service to the public and, just like rates and routes, are beyond the power of states to regulate or otherwise affect by local law.

*Butcher,* 813 F.Supp. at 517–18.

matter and Centennial Express's unilateral action of conducting scheduled passenger service in direct conflict with the Authority's Minimum Standards. I agree that the delay in the administrative forum and Centennial Express's violation of the Minimum Standards are regrettable and unfortunate. However, on balance, I believe this court should defer to the FAA's jurisdiction on both the proprietary powers question and the federal funding issue in keeping with the doctrine of primary jurisdiction.

The doctrine of primary jurisdiction, also known as the deference doctrine, is "a means of coordinating administrative and judicial machinery" to promote consistent decisions that reflect agency expertise. *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 580 (1st Cir.1979). The doctrine does not determine the existence of jurisdiction. Instead, it "comes into play only when both the court and the agency have jurisdiction over at least portions of the dispute." *Id.* at 581 n. 1. The issue "is one of harmony, efficiency, and prudence." *Id.*

In determining whether to defer to an agency, courts should examine three factors: "(1) whether the agency determination lay at the heart of the task assigned the agency by Congress; (2) whether agency expertise was required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." *Id.* at 580–81. Another consideration may be whether the agency has an established procedure designed to resolve particular kinds of disputes. *See id.* at 581.

Here, Centennial Express has filed a formal complaint with the FAA alleging that the Authority's ban on scheduled passenger services is discriminatory and therefore invalid under federal funding regulations. The state court system is confronted with the same question: whether the Authority's ban is non-discriminatory. This is because both the applicability of the proprietary powers exception and Centennial Express's federal funding argument depend on the determination of that question. *See Midway Airlines, Inc. v. County of Westchester*, 584 F.Supp. 436, 440–41 (S.D.N.Y.1984) (airport regulations imposed pursuant to proprietary powers must be reasonable, non-arbitrary, and non-discriminatory); *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1028–29 (N.D.Tex.1973) (an airport regulation that conflicts with federal non-discrimination requirements will not be upheld and is in violation of the federal funding assurances).[7] I agree with the majority that we possess concurrent jurisdiction with the FAA on whether the Authority's ban is non-discriminatory. *See County of Broome v. Commuter Airlines, Inc.*, 83 A.D.2d 742, 442 N.Y.S.2d 652, 654–55 (1981) (stating that state courts have jurisdiction to determine the applicability of the proprietary powers exception); *City of Dallas*, 371 F.Supp. at 1028–29 (finding an airport proprietor in violation of federal funding requirements).

As I read the sparse precedent in this area, discrimination may occur not only within a class of aeronautical users, but also between classes of aeronautical users. *See City of Dallas*, 371 F.Supp. at 1031. In *City of Dallas*, the court held that prohibition of scheduled passenger service at an airport that permitted passenger charter flights impermissibly discriminated between classes of airport users. *See id.* In reaching this conclusion, the court stated:

> [C]harter flights carrying passengers for hire on an unscheduled basis will continue

---

7. I question the majority's interpretation of the scope of the proprietary powers exception. The proprietary powers exception allows a publicly owned airport to take certain actions in its capacity as a proprietor that it could not take as a regulator under its police power. *See City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 635 n. 14, 93 S.Ct. 1854, 1861 n. 14, 36 L.Ed.2d 547 (1973). However, airport regulations imposed pursuant to proprietary powers must be reasonable, non-arbitrary, and non-discriminatory. *See Midway*, 584 F.Supp. at 440–

41. The precise scope of the proprietary powers exception is unsettled. *See Western Air Lines, Inc. v. Port Auth.*, 658 F.Supp. 952, 956 (S.D.N.Y. 1986). However, proprietary powers are extremely limited, *see City of Houston v. Federal Aviation Admin.*, 679 F.2d 1184, 1194 (5th Cir. 1982), and "have never been deemed broad enough to authorize a municipality to adopt regulations which are in direct conflict with FAA regulations." *Skydiving Ctr. of Greater Washington, D.C., Inc. v. St. Mary's County Airport Comm'n*, 823 F.Supp. 1273, 1283 (D.Md.1993).

to operate out of Love Field.... [S]ome of the operations to remain at Love Field will use planes larger than Southwest's; some will use planes noisier than Southwest's; some will use planes identical to Southwest's....

....

... In place of the preference accorded mass transportation ... Plaintiffs herein, in determining who shall have access to Love Field, have preferred private aircraft, corporate jets, unscheduled cargo flights, maintenance flights, and ferry flights over Southwest's commercial service....

....

... Plaintiffs' unsystematic classification discriminates ... between uses within the same general class.... Charter flights, which may use larger or smaller aircraft than Southwest Airlines, may remain at Love Field, while Southwest Airlines must go.

*Id.* at 1028, 1029, 1031; *see also Midway,* 584 F.Supp. at 440–41 (holding application for access to airport in abeyance was a valid exercise of proprietary powers because airport board was not banning a particular user from the airport, only asking for adequate time to formulate plans to allocate scarce resources).

The majority's discussion of proprietary powers fails to address the non-discrimination requirement of the proprietary powers doctrine. In a separate discussion dealing with the issue of whether the Authority is in violation of its grant assurances of non-discrimination, the majority states that "the Authority is not discriminating against a particular operator because the ban on scheduled passenger service applies to all airport users equally." Maj. op. at 596. In other words, the majority holds that the ban is not discriminatory because the Authority has never allowed scheduled passenger service at Centennial Airport. *See id.* at 596 n. 12. The majority attempts to distinguish *City of Dallas* on the basis that the ban on scheduled passenger services in that case prohibited operations previously allowed at the airport, while the Authority has never permitted un-

scheduled passenger services at Centennial Airport. *See id.* (discussing *City of Dallas* ).

However, the rationale of the opinion in *City of Dallas* did not turn on the airport's previous consent to the operations they subsequently sought to prohibit. Rather, the critical holding of *City of Dallas* is that discrimination occurs not only within a class, but also between classes. *See City of Dallas,* 371 F.Supp. at 1031. Although it is accurate to say that the Authority's ban on scheduled passenger services applies equally to all airport users, this fact does not cure the discrimination occurring in this case when the Authority permits other carriers to provide unscheduled passenger services using similar planes, similar flight patterns, making the same or more noise, and carrying the same or greater number of passengers as Centennial Express would in providing scheduled passenger service, as our record here shows. Hence, even assuming that the Authority's ban on scheduled passenger service falls within the scope of the proprietary powers exception, 49 U.S.C. § 41713(b)(3), the Authority's ban on scheduled passenger service may be unenforceable because it impermissibly discriminates between classes of airport users.

Our record reflects that there are numerous other Part 135 air carriers—air carriers conducting similar flight operations using the similar aircraft and carrying the same number of passengers—at Centennial Airport. Some of these carriers are operating under an air carrier certificate identical to the one that the FAA issued to Centennial Express. With respect to noise, the King Air aircraft operated by Centennial Express is quieter than a number of other aircraft currently in use at the airport, and there are at least twenty planes operating out of the airport similar to those used by Centennial Express. The only difference between these services and those offered by Centennial Express is that Centennial Express makes its rates and destinations known to the public in advance.

Complicating matters further, the Authority's ban appears to be contrary to the purpose of a public airport—operation "for the use and benefit of the public ... open to all types, kinds, and classes of aeronautical use

on fair and reasonable terms without discrimination between such types, kinds, and classes." 14 C.F.R. § 152, app. D, ¶ 18 (1997). Absent extraordinary circumstances, a public airport, such as Centennial Airport, should not be permitted to cater to special private interests, i.e., those individuals and corporations possessing the financial resources to either own aircraft or pay the high cost of charter flights. In addition, the Authority's ban may run afoul of the FAA's long-standing policy in favor of mass-transportation over private aircraft. *See City of Dallas,* 371 F.Supp. at 1029 ("Since commercial aviation represents the right of a greater number of people to use the navigable airspace of the United States, implementation of the Congressional policy requires a preference for commercial aircraft over private aircraft (and by implication over air cargo).").

Although other courts have discussed the definition of "discrimination" in the context of aeronautical operations,[8] whether this ban constitutes impermissible discrimination presents a complex and troublesome question because the FAA indicated in its informal letter to the Authority that it may change its policies to allow the proprietor of a single airport to discriminate against classes of users so long as the proprietor adheres to a regional plan which, as a whole, satisfies federal anti-discrimination requirements.

Turning to the three-part test articulated in *Mashpee Tribe,* I would hold that the question of whether the ban is non-discriminatory lays at the heart of the task assigned to the FAA by Congress. The determination of this question requires statutory interpretation of the ADA, particularly with respect to the proprietary powers issue because the facts present a matter of first impression regarding the scope of 49 U.S.C. § 41713(b)(3). Interpretation of the ADA is a task assigned to the FAA by Congress. *See Tivolino Teller House, Inc. v. Fagan,* 926 P.2d 1208, 1215 (Colo.1996) (stating that an agency is charged with the administration and enforcement of its statutory scheme, and courts must give deference to administrative interpretations of statutes); *Ross v. Denver Dep't of Health & Hosps.,* 883 P.2d 516, 519

(Colo.App.1994) (stating that interpretation of a rule or regulation by the agency charged with its enforcement is generally entitled to great deference).

The issue of whether the Authority's ban is non-discriminatory also presents policy considerations properly left to the FAA. The FAA indicated in its informal letter that it currently permits multiple airports under joint ownership to allocate the operations of different classes of aircraft, but that such allocation is not permitted among airports under separate ownership. The FAA then stated:

> [Y]our letter raises a policy issue relating to how to harmonize several important goals—allowing the citizens of a region to plan and manage their aviation resources on a regional basis, while at the same time preserving and enhancing the performance of the national aviation system and ensuring that statutory and regulatory requirements associated with use of Federal grant funds are not violated.... We firmly support regional planning and decision-making and strongly believe that local governments should, wherever possible, plan, develop and operate their transportation systems in an integrated and regional context, *consistent with applicable Federal law....*
>
> [This case presents the question of] whether the Department should initiate a change to present policy to permit two or more Federally-aided airports in an area to allocate among themselves the operations of different types of classes of aircraft, through an enforceable regional planning agreement. Because *this would be a significant policy change,* full consideration by the public and the aviation community is warranted. Therefore, we will be initiating, early next year, a process to obtain a full range of views on this issue. *Currently, existing policy on airport access must be complied with.*

(Emphasis added.) By holding that the Authority is permitted to ban certain classes of service in the name of regional planning, the majority intrudes upon the FAA's authority

---

**8.** *See, e.g., City of Dallas,* 371 F.Supp. at 1029;    *Western,* 658 F.Supp. at 958–59.

to implement and enforce its policies as mandated by Congress.

Although the FAA's letter is not binding, we have said that courts should take particular notice of the persuasive authority provided by such guidance. *See Banner Adver., Inc. v. City of Boulder,* 868 P.2d 1077, 1083 (Colo.1994). The FAA's letter persuades me that this case raises important policy matters that should not be resolved by this court, but rather by that agency.

The second prong of *Mashpee Tribe* is whether agency expertise is required to unravel intricate, technical facts. A determination of the policy issues presented in this case requires consideration on a regional and national level of facts not developed in this record but known to the FAA. Examples of the factual issues that must be addressed are the passenger service needs of airports located in Colorado, such as Denver International Airport and Centennial Airport, and the airports located in Broomfield, Jefferson County, Greeley, and Colorado Springs, and how these services relate to the public aviation needs on a local, regional, and national level. The third prong of *Mashpee Tribe* is whether an agency determination would materially aid the court. In my view, the state court system would benefit greatly from the expertise of the FAA in interpreting federal law, particularly on the first impression issue of proprietary powers.

Finally, I note that the FAA's informal letter to the Authority stated that the exclusion of a particular class of service is generally arbitrary and invalid. This suggests a high probability of inconsistency between the majority's decision and the FAA's decision. "[H]armony, efficiency, and prudence" dictate deference in this case. *Mashpee Tribe,* 592 F.2d at 581 n. 1.[9]

## IV.

I agree with the majority that local, regional, and national planning is a priority. However, I believe the Authority's ban on scheduled passenger service must be considered in the context of the public's aviation needs on the broadest possible basis by a forum designated by Congress to determine aviation policy and to decide conflicting needs among a local area, a state, and the nation. Thus, the question of whether the Authority's ban should be considered discriminatory or arbitrary is best determined by the federal agency charged with the responsibility for such policy decisions. The FAA possesses the expertise to consider the arguments advanced by the majority in light of the aviation needs of the public for the area near Centennial and to coordinate this public need with the services offered by other airports located in Colorado. Irrespective of the precipitous action by Centennial Express and the inaction of the FAA, the FAA and not the state court system is better equipped to resolve these policy matters. We should defer to the FAA regarding the scope of the proprietary powers exception and the issue concerning federal funding violations. Hence, I respectfully dissent.

**9.** Although I would hold that we should defer to the FAA on the proprietary powers and funding issues, I possess additional reservations regarding the majority's determination that the Authority's ban is non-discriminatory.

The majority states that the Authority's ban is necessary for the safe operation of the airport because Centennial Airport lacks a terminal, security, and baggage systems. *See* maj. op. at 596. However, this argument might serve to reinforce the discriminatory nature of the ban. If safe passenger service requires such facilities, then charter flights and other unscheduled passenger services available to the more affluent would also be prohibited at Centennial Airport. I question whether the Authority's ban can be characterized as a safety regulation.

The majority states that the Authority's ban is necessary to service the civil aviation needs of the public because scheduled passenger services would create congestion, disrupting the services currently available at Centennial Airport by diverting scheduled passenger services to Denver International Airport. The district court found that the airport was approaching capacity but made no findings that Centennial Express's proposed scheduled passenger service "would disrupt" current services. *Cf. Midway,* 584 F.Supp. at 439 (extensive facts supporting the determination that the airport was congested). Under accepted federal aviation principles, it appears that a proprietor of a single airport may not circumvent the federal discrimination requirements simply because another airport in the vicinity under separate ownership is in compliance with federal anti-discrimination regulations. *See Western,* 658 F.Supp. at 957–58; FAA Order 5190.6A § 4–8(d) (Oct. 2, 1989).

I am authorized to say that Justice MAR-TINEZ joins in this dissent.